COLE and another, Appellants, vs. GETZINGER and others, Respondents.

*March 17 — June 24, 1897.*

*Equity: Setting aside conveyance of land: Fraud: Presumption arising from situation of parties: Evidence: Practice: Parties: Notice.*

1. Where a man eighty-eight years of age, nearly blind, and feeble in mind and body, conveyed away his farm which constituted all his property for much less than its real value, without making provision for his own support, and his daughter and her husband, with whom he lived, participated in the transaction and received a large part of the proceeds to the exclusion of other children, who had claims on his bounty and were not notified of the proposed sale, it will be presumed that the transaction was fraudulent, and equitable relief will be granted unless such presumption is rebutted, even though the evidence is insufficient to establish actual fraud.

Cole and another vs. Getzinger and others.

:2. In an action by the defrauded heirs to set aside such a conveyance the grantor was not shown to have taken part in the negotiations, or to have ever authorized them or known anything about them until the notary came to execute the conveyance. Letters written to and by the son-in-law and claimed to be an important part of the negotiations had come into possession of one of the defendants who had acted as agent for the purchasers, but he had failed to produce them in response to a subpœna *duces tecum*. It was not shown that the grantor had been informed of the contents of such letters, or that he had directed anything to be written in reply. The notary who drew up the papers knew nothing about the negotiations or the bargain, and his testimony did not show that the transaction was fair and free from undue influence. *Held*, that the presumption of fraud arising from the nature of the transaction and the relation of the parties had been strengthened rather than rebutted.

3. A court of equity, having obtained jurisdiction in a suit by the defrauded heirs to set aside such a conveyance, will not dismiss the action because the specific relief asked has become impracticable and the only alternative relief possible is mere compensatory damages, but will retain and decide it and decree the payment of such damages.

4. One of the heirs, who had been made a defendant and had answered admitting the truth of the complaint and claiming the same relief as the plaintiffs, will be regarded as a plaintiff and given relief as such.

5. R., who had undertaken to purchase land for G., obtained a conveyance thereof to a third person for $3,000, through fraud and undue influence, and immediately caused it to be conveyed to G. for $4,200, R. retaining the difference. *Held*, that G. was not chargeable with constructive notice of the fraud, since R.'s relation to the subject matter was such as would induce him to withhold the facts from G. G. was, therefore, a *bona fide* purchaser, and the conveyance to him could not be set aside.

APPEAL from a judgment of the circuit court for Jefferson county: JOHN R. BENNETT, Circuit Judge. *Affirmed in part; reversed in part.*

This action was brought to set aside a deed of conveyance of a certain farm, containing about seventy-five acres, in the town of Herman, Dodge county, made by Ira S. B. Cole, November 22, 1892, to the defendant *Alice Farmer*, on the

Cole and another vs. Getzinger and others.

ground that it was procured through fraud, undue influence, and want of capacity of the grantor. On the 29th of the same month, *Alice Farmer* conveyed the same premises to the defendant *Peter Getzinger*. At this time the grantor, Ira S. B. Cole, was living with the defendants *Cassius M. Moody* and *Betsey C. Moody*, his daughter; and his son *Ira B. Cole*, one of the plaintiffs, was occupying the premises as a tenant under his father. Ira S. B. Cole died intestate, March 17, 1893, leaving five heirs at law, two of whom (*Ira B. Cole* and *Sabra J. Kaiser*) joined in bringing this action, making the others (said *Betsey C. Moody*, *Edwin Cole*, and *Charlotte Losee*) defendants, as their consent to join as plaintiffs could not be obtained.

It was alleged, in substance, that the farm was worth $5,500 at the time, and that Ira S. B. Cole was about eighty-eight years of age, nearly blind, and very infirm and feeble, and was mentally incompetent to transact business or guard or protect his interests; that the defendants *Cassius M. Moody*, *Betsey C. Moody*, *R. W. Roberts*, *Alice Farmer*, and *Peter Getzinger* conspired together to defraud him of his farm, and to procure a deed thereof for half of its value, and appropriate the proceeds thereof to the use of said *Moody* and wife, and divide the profits between the defendants *Roberts* and *Getzinger*,— the deed to be taken to the defendant *Alice Farmer*, a member of the family of said *Roberts*, who was to convey the land to *Getzinger;* that the consideration for the deed to said *Farmer* was to be $3,000, and of the deed from *Farmer* to *Getzinger* $4,200; that said $3,000 was to be paid out of the money received from *Getzinger*, and the remaining $1,200 was to belong to said *Roberts*.

The complaint alleges, in substance, the execution of said scheme, and that the deed was procured by the fraudulent, undue, and unlawful influence of said *Moody*, and that the grantor was induced to give said *Moody* $500, and his wife, *Betsey C.*, $2,000, of the purchase price of $3,000, and *Rob-*

*erts* received and retained to his own use $1,200 of the $4,200 in fact paid by *Getzinger* for the farm; that the said Ira S. B. Cole had no other property than this farm; that no agreement or provision in the transaction was made for his support; and that no notice of said proposed transaction had been given to his other relatives; and the plaintiffs asked judgment that the deed from Ira S. B. Cole to *Alice Farmer*, and also the deed from *Farmer* to *Getzinger*, should be set aside and canceled, and, if the land should be beyond the reach of the decree, that the defendants account for two fifths of said moneys paid by said *Getzinger* for the farm, and for general relief.

The defendants *Moody* and wife, in their answer, admitted the age of Ira S. B. Cole, and that he had lived with them more than sixteen years; and averred that they had no knowledge or information sufficient to form a belief as to the value of the land, the deeding of it to *Getzinger*, the appropriation of $1,200 by *Roberts*, or that no notice of said negotiations or transactions had been given to others of his relatives; and alleged that the sale of the land was not made at their instigation, but one Nevitt was, at said Cole's request, called on to prepare the deed, and that they in no way influenced or controlled anybody in the matter; and they claimed that the $2,500 received by them was no more than a fair compensation for the care and support of said Cole, and for *Betsey C. Moody's* fair share of his estate. The defendants *Roberts*, *Farmer*, and *Getzinger*, in their answers, after admitting that Cole was eighty-eight years of age, and lived with the *Moodys* many years, that he died March 20, 1893, intestate, and that he deeded the land to *Alice Farmer* and she deeded the same to *Getzinger* for $4,200, averred a want of knowledge or information sufficient to form a belief as to all other matters.   *Getzinger* claimed, in his answer, to have purchased the land from *Alice Farmer* in good faith, for a valuable consideration, believing she had a good title thereto.

The defendant *Charlotte Losee*, one of the claimant heirs, admitted the truth of the complaint, and claimed the same relief demanded by the plaintiffs.

At the trial evidence was given by six farmers residing near the land that it was worth, at the time the deed was made, $75 to $80 per acre. Evidence was given showing the death of Ira S. B. Cole intestate, and that his heirs were as stated; that he had lived with the defendants *Moody* and wife fourteen years before his death; that one of the plaintiffs (*Ira B. Cole*) was living on the premises at the time the deeds in question were made, as the tenant of his said father, and he had no notice that any transfer was to be made, and two others of his daughters (*Mrs. Kaiser* and *Mrs. Losee*) lived near him; that he first learned of the conveyance December 1, 1892, from *Getzinger*.

The defendant *Betsey C. Moody* testified that neither she nor her husband had any agency for the sale of the land; that her father executed the deed at their house; that she never saw *Alice Farmer*, and she was never at their house, and that her father never saw her during the negotiations; that her father conducted the negotiations. "I suppose he sold the property. I didn't hear anybody make any bargain with him. I know that *Roberts* wrote a letter to him in regard to it. I don't know of any one conducting the negotiations except *Roberts*. Mr. *Roberts* never saw father about it. There wasn't anybody that ever saw father. I know *Roberts* bought the land. He came to the house, but I don't know how long before he bought the place. He did not see father, or ask to see him, as he was lying down for his afternoon nap." She further testified that she wrote letters to *Roberts* about the sale of the farm,— did not know, could not tell, how many; could not make an estimate. "*Roberts* wrote father about it. All of father's letters came in my husband's name; were directed in his name." Further, that she couldn't tell how many there were; that she had no

copies of them; that the letters were given by her husband to *Roberts* about the time the suit was commenced against *Getzinger* for trespass; that she was not in the room when the deed was executed to *Alice Farmer;* that $2,000 of the $3,000 for which the land was sold — being at the rate of $40 per acre — was given to her, and $500 to her husband, in bank checks, because he had lived with them so many years; that he said it was for his care and support; that she did not ask him for it, and there never was any arrangement that he should pay for his board.

The defendant *Cassius M. Moody* testified that he did not conduct any negotiations for a sale of the property; that he had a conversation with *Roberts* about it after he had received a letter. "He asked what I wanted for my farm. I told him I didn't own any farm; that the farm belonged to Father Cole; and that was all that was said about the farm. Saw him again in Oshkosh, but don't remember anything about the conversation we had. Had a communication from him between these times, and met him several times, but don't remember any conversation we had except the first time." He testified having given *Roberts* all the correspondence in regard to the farm.

Plaintiffs' counsel here called on *Roberts* to produce these letters, in response to a subpœna *duces tecum* served on him eleven days previous, and the said *Roberts*, being sworn, testified that he received the letters written by him to *Moody*, and that, if he had them at all, they were at his office, 200 miles distant, in Shawano county; that he had not seen them for over two years; that he had some one in possession of his office, running the bank, but did not know where the letters were; had not made any examination to see; had not written to his clerk; and had taken no steps to try to get them under the subpœna. Plaintiffs applied to the court for an attachment against *Roberts*, to compel production of the letters. The court refused the application. Plaintiffs

applied to strike out the answer of *Roberts* for not producing them, but it was refused.

*C. M. Moody* further testified: That Roberts did not see the old gentleman Cole at all during the negotiations, to his knowledge. "All the talk he had up there about it was with me, except the letters he wrote." That he (*Moody*) was not present when the deed was executed. That he paid back $80 of the purchase money to *Roberts*, but not out of the $2,500 given to himself and wife. "This was for a shortage of land, and *Roberts'* expenses. His exact words to me were: 'Take the certificate, and draw the money from the bank, and pay *Mr. Roberts* whatever he asks.' No sum was named." That he afterwards told him he had paid *Roberts* $80, and did not remember that he said anything. That the sale was consummated, the deeds delivered, and money paid over, without any notice, so far as he knew, to any one of the old gentleman's relatives.

It appeared that *Alice Farmer* did not buy the land, or pay anything for it, and had no interest in the transaction, but took the deed and executed a conveyance to *Getzinger* at the request of *Roberts*.

The defendant *Getzinger* testified: That he had two conversations with *Roberts* before he got the deed from *Alice Farmer*, in the first of which *Roberts* told him his farm was hardly large enough, to which he replied that he knew no neighbor who would sell unless Mr. Cole. That *Roberts* said he would go up that or the next week, and would see if Grandpa Cole would sell, and he asked him what he thought the property worth, and he answered that to him it was worth $4,000, and that was all he would give for it. That it was understood that he should go up and buy the land for him at $4,000. That he did not see *Roberts* after that, until he came and told him he could have the land for $4,200. That he came to his place two days before he got the deed, and said he would like to have him buy the land at $4,200. That

he told *Roberts* he would give the amount, but everything must be clear, and did not say anything further. That he said nothing to either old man Cole's son or daughter, living near him, about buying their father's land, until after he got the deed. *Roberts* said that Mr. Cole said he did not want it to get around much that he had sold the place, and that Cole wanted the money, and to get it as soon as possible, and he got it as soon as he could. That he paid *Roberts* $1,200 at his house, and he gave him the deed from *Miss Farmer*, and then he told *Roberts* that he thought that he (*Roberts*) bought it. That *Roberts* said that made no difference to him. That he did not ask why she bought it, and then sold it right off, nor why they placed in the deed "one dollar and other valuables" as the consideration. That he came to the bank with *Roberts*, and then he paid the $3,000 to the bank, and got the deed from Cole to *Alice Farmer*.

*Roberts*, being recalled, testified: He never had any conversation with the old man Cole about the purchase of the property, and that his only negotiations were with *Mr. Moody*. "Knew the old man Cole all my life, and that his age is eighty-eight, I believe." He went to the office of Nevitt, the notary who prepared the deed, alone, and wrote how he wanted the deed drawn. It was sent to the bank to collect $3,000, and was not in his possession until *Getzinger* paid that amount to the bank for the deed, and that he put the other $1,200 in his pocket. During the negotiations he said nothing to Ira B. Cole, nor any of the old gentleman's relatives, except *Mr.* and *Mrs. Moody*, and never informed the *Moodys* or old gentleman Cole that *Getzinger* was buying, or that more than $3,000 could be received for the land.

Passages from two letters, written November 1, 1892, and November 11, 1892, by the defendant *Betsey C. Moody*, to relatives, to which she signed her husband's name, were read in evidence, as follows: "Grandpa is about the same. He don't know anybody when they first come here. I can see

he fails slowly." " Grandpa has got so he cannot see to help himself at the table, or find anything he wants. He didn't know Uncle Will when he came here." One witness testified that in November, 1892, he noticed the old gentleman was very weak; that sometimes he would not know him; that he " would ask who I was, after I had talked in his presence so that he could hear me. *Mrs. Moody* prepared his food for him at the table. If questions were asked him, sometimes he would answer, and sometimes not. He seemed to be in bed most of the time." Witness thought he was not competent to transact business. Another witness testified that in November he appeared to be weak physically and mentally, and at times "I should say he didn't know his friends;" that when witness went there he thought he did not recognize him, and made no answer when he spoke to him. Another, who was at *Moody's* four months from December 3, 1892, testified to seeing the old man every day; that he was quite feeble; did not prepare his food at the table; did not always recognize his friends when they came in; sometimes, after his friends had conversed in his presence, he would ask who they were; when they went away from home, they had to leave him alone sometimes, locking the house; sometimes he went to bed, and sometimes staid in the chair; that was their custom when they went away. Two of his grandsons testified to having visited him in the spring of 1892, and that the old gentleman did not seem to know them, and to having tried to converse with him, but he did not seem to take any notice of it. At the close of the plaintiffs' testimony, on motion, the court dismissed the action as to the defendant *Getzinger*.

Five witnesses residing in the vicinity testified for defendants that the farm was worth from $55 to $60 an acre. Dr. H. B. Dale testified that he was acquainted with the mental capacity of Ira S. B. Cole in the fall of 1892, and previous thereto, to a certain extent; that his mental capacity was

good; that he did not remember just the date, but thought he saw him during the year 1892; when he last saw him he was not blind; did not remember when he last went to see him. Dr. Titus testified that he was somewhat acquainted with Ira S. B. Cole, but had never doctored him very much; that he was an old man, was infirm, and his mental capacity was somewhat in keeping with his infirm age, but he seemed to know him every time he went there, and seemed to be generally posted as to things that were transpiring, and conversed with him in regard to things that he supposed interested him. He last saw him the 2d of December, 1892. *"Mr. Moody* asked me whether I thought his father-in-law was of sound mind. I know we talked the matter over considerably; . . . I questioned him to see what his memory was, and to see how he could remember the names of his family, etc. He seemed to answer all right, and I judged from that that he was in mind as people are at that age, and of such infirmities as he had. He was feeble." Another witness testified he was acquainted with Ira S. B. Cole, and saw him frequently in 1892, and talked with him on different subjects; that he never saw anything but that he was of sound mind; never saw any change in him in the thirty-nine years that he had known him.

C. R. Nevitt, the notary who prepared the deed, testified: That his mental condition and capacity was good for an old man. That he was aware of what he was saying and doing. That he drew up the body of the deed, and it was executed at *Moody's* residence, his wife being present. "When I got there, I pulled out the paper, and said: 'Mr. Cole, you have sold your farm, I understand?' He replied, 'Yes, sir; I have sold my farm.' 'Shall I make the deed,— finish the deed?' 'Yes, sir.' And some information was given me by which I got the description. I entered it in the blank, read it over to him, and my memory is that he objected to some little part of it that it was not quite perfect to his idea, and that

some slight alteration was made.  He signed it.  The deed was acknowledged and witnessed there at that time; and that is all.  *Mrs. Moody* was present, and *Mr. Moody*, when we first began, but he left the room before it was completed, and afterwards returned.  After the deed was finished, I asked him, 'What are you going to do with your money?'  He pointed to his daughter *Mrs. Moody*, sitting on the lounge, 'I give her $2,000.'  'What for?'  'Because she has taken care of me these many years.'  And then *Mr. Moody* came in.  The old gentleman looked up at him, and says: 'And *Cassius*, I will give you $500.  You have done your share towards my care.'  And he replied, 'Father, I should have taken just as good care of you, if you had not.'  Mr. Cole replied: '*Cash*, take money when you can get it.  You can't always get it.'  This was the substance of all that was said."  That he was in a hurry to return.  He also testified to directions given to *Moody* by Cole to have the deed sent on, so he could get the money, and to get one certificate of $2,000 for *Mrs. Moody*, and one of $500 for *Mr. Moody*, and the balance for himself.  That the deed was forwarded accordingly through the bank at Oshkosh to the bank at Hartford, and he purchased with the proceeds a certificate for *Mrs. Moody* of $2,000, and one of $500 for *Mr. Moody*, and one of $497 for Mr. Cole.  That " at all these times the old man knew perfectly what he was doing, and his mental condition was good."  There was nothing said of any other price than $3,000.

Mrs. Nevitt testified to having known Mr. Cole for fifteen years or more, and he acted just as he always acted, except he did not talk quite so much.  When he did talk, he seemed to understand what he was talking about as much as ever he did, and such was his condition the day the deed was executed.  His eye-sight had failed him somewhat.  His general health had failed him the same as any old gentleman.

The court found that Ira S. B. Cole deeded the land to

defendant *Alice Farmer* without any fraud on her part or the part of defendants *Peter Getzinger, Cassius M. Moody, Betsey C. Moody,* and *R. W. Roberts,* or either of them; that said *Roberts* purchased said land of said Cole for $3,000, having made an arrangement to sell it to *Getzinger* for $4,200, but that he practiced no fraud, directly or indirectly, on said Cole, or in selling the land to *Getzinger,* and that there was no conspiracy between any of the defendants *Getzinger, Roberts, Farmer,* or the *Moodys,* or either of them, to induce Cole to sell and deed said land; that said Cole was of sound mind, and competent to make a deed; that *Getzinger* was a purchaser of the land in good faith and for a valuable consideration, namely, $4,200; and that the value of the land was $65 an acre. Judgment was entered on the finding against the plaintiffs, from which they appealed.

For the appellants there was a brief by *Sawyer & Sawyer,* and oral argument by *H. W. Sawyer.* They argued, among other things, that independent of affirmative proof the presumption of law is that the transaction in this case was fraudulent, and the burden of proof is on the defendants to show that it was not. *Davis v. Dean,* 66 Wis. 100; *Cowee v. Cornell,* 75 N. Y. 91; *Bowe v. Bowe,* 42 Mich. 195; *Farmer's Ex'r v. Farmer,* 39 N. J. Eq. 211; *Condit v. Blackwell,* 22 id. 481; *Porter v. Woodruff,* 36 id. 174; *Tate v. Williamson,* L. R. 1 Eq. 528; *Rhodes v. Bates,* 1 Ch. App. 252; *Billage v. Southee,* 9 Hare, 534; *Crawford v. Hoeft,* 58 Mich. 1; 2 Pomeroy, Eq. Jur. § 928; *Kelly's Heirs v. McGuire,* 15 Ark. 555; *White v. White,* 89 Ill. 460; *Willcox v. Jackson,* 51 Iowa, 208; *Butler v. Duncan,* 47 Mich. 94; *Brown v. Hall,* 14 R. I. 249; *Gifford v. Thorn,* 9 N. J. Eq. 702; *Chesterfield v. Janssen,* 2 Ves. Sr. 124; *Hall v. Perkins,* 3 Wend. 626; *Smith v. Cuddy,* 96 Mich. 562. The jurisdiction on this ground applies to transactions between persons occupying relations of trust and confidence, and to all near relatives. *Davis v. Dean,* 66 Wis. 100; *Watkins v. Brandt,* 46 id. 425; Story, Eq. Jur. 310; Kerr, Fraud

& M. 183, 184; 2 Pomeroy, Eq. Jur. § 963; *Sears v. Shafer*, 6 N. Y. 268; *Nichols v. McCarthy*, 53 Conn. 299; *Allore v. Jewell*, 94 U. S. 506; *Green v. Roworth*, 113 N. Y. 462; *Kelly v. Smith*, 73 Wis. 191.

For the respondents *Moody* there was a brief by *Bouck & Hilton;* for the respondents *Roberts* and *Farmer* there was a brief by *Goodrick & Goodrick;* and the cause was argued orally by *Gabe Bouck*, *E. J. Goodrick*, and *J. E. Malone*.

The following opinion was filed April 30, 1897:

PINNEY, J. 1. The facts, as disclosed by the evidence, have been stated so fully that but little comment is necessary. The deed of conveyance from Ira S. B. Cole to *Alice Farmer* of his farm of about seventy-five acres was procured from him presumptively by fraud and undue influence, practiced by the defendants *Cassius M. Moody*, *Betsey C. Moody*, his wife, and *Roberts*. The consideration for the deed was largely inadequate. The lands, found by the court worth $65 per acre, were sold for $40 per acre, and the sum of $4,200, paid for the farm within a few days thereafter, was received by these parties, $2,500 by *Moody* and his wife, and $1,200 by *Roberts;* and all that remained for Cole, the defrauded party, for his farm, was $500, further reduced to about $420 by the payment of the claim made on the part of *Roberts*, not shown to have had in fact any meritorious foundation; and finally it is left to inference that he ever received this small sum, for there is no evidence that it ever actually came to his hands. The evidence clearly shows that the parties named were actually in complicity to secure to themselves, as they did, nearly all the proceeds of the old gentleman's farm, the only property he had. He was a man burdened with the infirmities of his great age of eighty-eight years, and weak and feeble, both in mind and body. The decided preponderance of proof tends to show that, left to his own resources and methods, he was not competent to properly

and safely conduct and conclude a business transaction of the character of the one under consideration. He had lived with his son-in-law and his daughter, the *Moodys*, for the period of about sixteen years. His condition, and the relations between the parties, gave rise to mutual trust and confidence, and they owed him the duty to guard his interests and protect him against the intrigues and wiles of designing persons. Their relations and duty to him, in his dependent and feeble condition, were of a trust or fiduciary character. In respect to the making of this conveyance, their selfish interests were thus brought in direct conflict with their duty. It was greatly unjust to his four other children, who had claims on his bounty. None of his relatives or friends, save those who were to profit by it, or those acting for them, had any notice of the transaction, and some caution seems to have been exercised to prevent its being known. As was said in *Watkins v. Brant*, 46 Wis. 425: "This secrecy, if not a badge of fraud, is surely a badge of undue influence." The matter of the conveyance originated with *Roberts*, apparently, who started to buy the farm for *Getzinger*, and proposed to go and see Cole about buying it. He had known Cole all his life, and knew his great age, and evidently understood his situation and condition and his relations with the *Moodys;* and an understanding was arrived at in regard to it, and with the result as stated.

It is a well-established principle in courts of equity that a conveyance will be set aside wherever it has been obtained through undue influence over a person greatly under the power of another, if there is inadequacy of price, or clear ground of inference that the confidence reposed has been abused, or advantage been taken of incompetency or weakness of understanding, or clouded or enfeebled faculties; and many authorities to this effect are cited in *Earl of Chesterfield v. Janssen*, 1 White & T. Lead. Cas. Eq. pt. 2, 826, 827. "If deeds are obtained," said MARSHALL, C. J., in *Harding v.*

*Handy*, 11 Wheat. 104, 125, "by the exercise of undue in-
fluence over a man whose mind has ceased to be the safe
guide of his actions, it is against conscience for him who has
obtained them to derive any advantage from them. It is the
peculiar province of a court of conscience to set them aside.
That a court of equity will interpose in such a case is among
its best-settled principles."

The general principle is that where, from the nature of
the transaction and the situation and relation of the parties,
fraud and imposition may be presumed, unless their presump-
tion be rebutted, relief will be granted in equity, although
fraud in fact be not proved, and equitable jurisdiction may
be exercised in such cases in respect to the instrument un-
duly obtained, when a court of law could not enter into the
question. *Jackson v. King*, 4 Cow. 207–220; *Hall v. Perkins*,
3 Wend. 626–631; *Taylor v. Taylor*, 8 How. 183; *Wheeler v.
Smith*, 9 How. 55, 82. And many cases to this effect are cited
in the brief of plaintiffs' counsel.

The rule is strongly and clearly laid down in *Davis v.
Dean*, 66 Wis. 100, 110,— a case quite similar in principle,—
where it was said: "We do not say that fraud and undue
influence were proved affirmatively, but only that the cir-
cumstances suggest them. If the burden of proof is upon
the plaintiffs to show such fraud or undue influence, prob-
ably we could not disturb the findings of the circuit court,
which negative their existence. But, under the circumstances
of this case, the burden of proof is not upon the plaintiffs.
Because the relations of the parties to each other were those
of trust and confidence, and because of the suspicious cir-
cumstances under which the conveyances were made and
the injustice which would be inflicted upon the heirs of the
grantor if the conveyances are held valid, the law casts upon
the grantee the burden of showing that the conveyances are
untainted with undue influence or other fraud, but were the
intelligent and deliberate act of the grantor. This rule is to

protect the weak and unsuspicious from the cunning and fraud of those who stand in confidential relations to them, and has its foundation in good morals and sound policy. The grantee has failed to satisfy the requirements of the rule, and the presumption of injustice, fraud, and wrong stand against the conveyances, which he must remove before the court is authorized to say that they are valid." *Allore v. Jewell*, 94 U. S. 506; *Cowee v. Cornell*, 75 N. Y. 91; *Smith v. Cuddy*, 96 Mich. 562; *Turner v. Collins*, 7 Ch. App. 329; *Gandy v. Macauley*, 31 Ch. Div. 1.

The conveyance of the farm to *Alice Farmer* was to serve the uses and purposes of *Moody* and wife and *Roberts*, the latter attempting to and in fact profiting by the trust and confidence the grantor had in *Moody* and his wife. *Alice Farmer* was in no sense a purchaser of the farm. Her relation to the transaction was a passive one. It was not intended that it should be gainful, and there is nothing to show that she was privy to any improper design.

So far from rebutting the presumption of fraud and undue influence, the evidence of the defendants *Moody* and wife and *Roberts* materially strengthens it. The case is destitute of any evidence showing that the old gentleman personally ever took any part in any negotiations for the sale of the property, or ever authorized any. Neither of these persons is willing to admit that he or she negotiated the alleged sale. *Mrs. Moody* says she did not hear any one make any bargain with her father, and that *Roberts* never saw him about it. "There wasn't anybody that saw father." *Roberts* wrote him letters, which came in her husband's name, and he and she wrote letters in reply. *Moody* says he did not conduct any negotiations for the sale of the property, and he agrees that *Roberts* did not see Cole; that "all the talk he had up there was with me, and that was all, except the letters he wrote." *Roberts* says he never had any conversation with the old gentleman Cole about the purchase. "My only ne-

gotiations were with *Mr. Moody.* I went to the house at one time, but did not see Mr. Cole. Don't think I asked for him." So far as the evidence goes, the old gentleman seems to have been wholly ignored until the witness Nevitt called on him to execute a deed of conveyance of his farm. It does not even appear that he knew to whom the conveyance was made, nor, up to that time, that he had uttered an articulate word to any one in respect to the sale of the farm. Nor is there any evidence that he read or knew the contents of any of the letters written by *Roberts,* or that he either wrote or directed any to be written in reply. If the letters contained the negotiations, or important parts thereof, why did *Roberts* take pains to get the entire correspondence in his hands when litigation ensued in respect to the farm, and why were they 200 miles away when the trial occurred, he having been served in due season with a subpœna *duces tecum* for their production? They might be of great service to the defendants, or they might contain damaging evidence against them. The failure to produce them as called for certainly justifies unfavorable inferences. The evidence of Nevitt does not clear up the difficulty. He knew nothing about the negotiations or the bargain. It had already been made, according to his understanding, and he went there to put the transaction in legal form, and his testimony does not show that the transaction was fair, and free from undue influence. It does not seem to have occurred to him to inquire what reason existed why the old gentleman should sell his farm for only about two thirds of its value, and then give away nearly all the money, securing no agreement for his own maintenance, and making no provision for any of his other four living children. Our conclusion is that the presumption against the validity of the deed has not been removed, and that it must be regarded as having been procured by fraud and undue influence.

2. The evidence does not show that *Getzinger* was a party

to, or had notice, actual or constructive, of, the wrongful procurement of the deed to *Alice Farmer*. The only ground upon which it can be contended that he is affected by the fraud and undue influence intervening in the procurement of the deed is that *Roberts* had undertaken to act for him in making this particular purchase. Evidently *Roberts* did not intend to purchase the land as an investment, and, had *Getzinger* known that he had procured the title and controlled it for $3,000, when he was exacting of him $4,200 for it, he might well have claimed the benefit of the purchase at $3,000 and a fair commission. *Roberts* had no idea of giving him the bonus of $1,200, which he says he put in his own pocket. And if *Roberts* was unfaithful to the duties of such agency, *Getzinger* would not be affected by constructive notice of what he did in procuring the title to be conveyed to *Alice Farmer* for the benefit of *Moody* and wife, and for his own great gain as well. *Law v. Grant*, 37 Wis. 548. The rule that the principal is affected with knowledge acquired by the agent in the transaction to which his agency relates is based upon the duty of the agent to disclose to his principal all knowledge and information he possessed at the time or acquired in relation to the subject matter of the agency, and the presumption is that he communicates it accordingly; but he cannot be expected to communicate information which, from his relation to the subject matter, he would not disclose; and where his relation to the previous transaction is such as would be sufficient to induce him to withhold the information the presumption of its communication is rebutted. *Melms v. Pabst Brewing Co.* 93 Wis. 154, 167–169, and cases cited. *Roberts* would not be likely to disclose that he was exacting for himself, of his principal, $1,200 more for the property than it was purchased for. In any view that may be taken of the case, we think that *Getzinger* must be regarded as a *bona fide* purchaser for value, and is entitled, as such, to hold the land.

3. The remedy remaining to the plaintiffs is, therefore, for damages or compensation, to be adjudged in money, for that of which they have been deprived, as heirs at law of their ancestor, by fraud and undue influence practiced on such ancestor. The land was not converted by the voluntary and lawful consent of their ancestor into money, but still remained to him, in equity, in its character and quality of real estate; but the trust that otherwise would have attached to the land in his favor and in favor of the plaintiffs as his heirs at law, upon his death, was displaced by the further wrongful act of these parties, namely, the causing of the title to become vested in a *bona fide* purchaser for value, so that the only relief that can be given under these circumstances is to charge them with the value of the land, or interest therein, of which they have been thus deprived, by way of compensation. It appears to be well settled that where a court of equity obtains jurisdiction for the purpose of granting some distinctively equitable relief such as the specific performance of a contract or the rescission or cancellation of some instrument, and it appears from facts disclosed at the hearing, but not known to the plaintiff when he brought his suit, that the special relief prayed for has become impracticable, and the plaintiff is entitled to the only alternative relief possible,— of damages,— the court may, and generally will, instead of compelling the plaintiff to incur the double expense and trouble of an action at law, retain the cause, decide all the issues involved, and decree the payment of mere compensatory damages (1 Pomeroy, Eq. Jur. § 237); especially since, by the Code, the distinction between courts of law and courts of equity has been abolished. *Hall v. Delaplaine*, 5 Wis. 206, 213; *Tenney v. State Bank*, 20 Wis. 161, 163, 164; *Hopkins v. Gilman*, 22 Wis. 476, 480; *Combs v. Scott*, 76 Wis. 672; *Van Rensselaer v. Van Rensselaer*, 113 N. Y. 208.

One of the heirs — *Charlotte Losee* — having been made a

defendant and answered admitting the complaint and claim-ing the same relief as the plaintiffs, may properly be re-garded as practically a plaintiff and entitled to the same relief.

It follows, therefore, that the judgment of the circuit court dismissing the complaint should be reversed, with costs, ex-cept as to the defendant *Getzinger*, and as to him it should be affirmed, with costs; and the cause must be remanded to the circuit court with directions to enter judgment in favor of the plaintiffs and of *Charlotte Losee*, awarding to each one fifth of the value of said premises, with costs.

*By the Court.*— Judgment is ordered accordingly.

A motion for a rehearing was denied June 24, 1897.