FARMERS LIFE INSURANCE ASSOCIATION, Appellant, vs. HOUGHTON, imp., Respondent.

*February 10—March 8, 1932.*

For the appellant there was a brief by *M. D. Larson* of Madison, *Roy P. Wilcox* of Eau Claire, *H. L. Ekern* of Madison, *H. W. Adams* of Beloit, and *Rush & Devos* of Neillsville, and oral argument by *Mr. Wilcox* and *Mr. A. L. Devos*.

For the respondent there was a brief by *Perry & Perry* of Black River Falls and *Goggins, Brazeau & Graves* of

Wisconsin Rapids, and oral argument by *R. B. Graves* and *H. M. Perry.*

FAIRCHILD, J. In this case the payee of a negotiable promissory note seeks to hold the makers of that note. It is met with the defense on the part of respondent that his signature to the note was obtained by fraudulent representations. Two questions are thus presented: First, may a payee be a holder in due course? Second, assuming that a payee may be such a holder, and assuming that Fristad was guilty of making false representations, (a) are Fristad's misrepresentations, by reason of some application of the doctrine of *respondeat superior,* to be regarded as those of the payee; and (b) assuming that they are not, does the fact that Fristad was an officer of the appellant as well as of the bank affect appellant with notice of fraud?

A holder of a negotiable instrument means the payee or indorsee of a bill or note who is in possession of it. Sec. 116.01, Stats. And a holder in due course is a holder who took the instrument complete and regular upon its face, before it was due, in good faith and for value, without notice of any infirmity in the instrument or defect in the title of the person negotiating it. Sec. 116.57. An instrument must be said to have been negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. The wording of our Negotiable Instruments Law leaves no doubt that a payee under the circumstances prescribed is a holder in due course. A full discussion, with citation of authorities, is found in Brannan's Negotiable Instruments Law, Annotated (4th ed.) pp. 119 and 361, from which it appears that the view here expressed is supported by the weight of authority.

With respect to the other questions the evidence is clear that Fristad at no time during the transactions assumed to

or did act on behalf of the appellant. If the appellant is to be charged with responsibility for or notice of his fraud, it must be solely upon the ground of his official connection with the appellant and entirely grounded upon the fact that he was the treasurer of appellant.

The general rule that a principal is affected with constructive knowledge of material facts coming to his agent's knowledge while acting in the course of his employment does not apply to appellant under the facts in this case. This general rule has several qualifications which are suggested by human experience and recognized in the law. The communication of material facts to an agent is not notice to the principal when the circumstances are such as to raise a clear presumption that the agent will not transmit his knowledge to his principal, that is, such circumstances as are usually present when the agent is engaged in a transaction in which he is interested adversely to such principal. *Morriss v. O'Connor,* 206 Ala. 542, 90 South. 304; *Sims v. Southeast Missouri Trust Co.* 140 Ark. 365, 215 S. W. 671; *First Nat. Bank v. Aler,* 92 W. Va. 313, 114 S. E. 745. Also see note on "Agent's knowledge of defense to note transferred by him to his principal as affecting the latter's character as a *bona fide* holder," in L. R. A. 1918 C, p. 902.

An officer in several companies does not in every act represent each and all of such companies. 2 Corp. Jur. § 549; *In re Plankinton Bank,* 87 Wis. 378, 58 N. W. 784; *Cole v. Getzinger,* 96 Wis. 559, 71 N. W. 75; *Johnson v. Blumer,* 183 Wis. 369, 197 N. W. 340, 198 N. W. 277. In *Johnson v. Blumer, supra,* information acquired by the cashier of a bank, who was also the agent and later the executor of the last will of a mortgagee, was held not imputable to the principal—the mortgagee. This doctrine was there recognized and it was said: "A principal is not charged with the knowledge of an agent who acts in a dual

capacity and acquires such knowledge while representing adverse interests."

There are three distinct entities, each with distinct rights and interests involved in this transaction out of which the controversy arose—the insurance company appellant, Houghton the respondent, and the First State Bank of Humbird. In order to determine rights of the respective parties in the decision in this case these interests and identities must be sharply defined and kept mutually exclusive. It is conceded that the appellant and the bank had officers who were common to both corporations, but each company had its separate offices and distinct business. The bank was in trouble, and in order to complete an arrangement under which it would be able to continue as a going concern the respondent joined with others in signing a $5,000 note. This note was delivered to appellant, and upon the faith of it the appellant advanced the sum of $5,000, that being the amount presently required to meet the needs of the institution. The evidence indicates that respondent and the cashier of the bank, Fristad, as well as others, believed that the raising of this $5,000 and placing it at the disposal of the bank would bring the bank out of its trouble back into smooth waters. That the money was paid by turning over certificates of deposit which appellant owned and by issuing its check against its funds on deposit in the bank does not alter the situation so far as the rights of the appellant are concerned. The bank's assets were increased by this amount and an adequate and valid consideration for the note passed from appellant into the channels specified by the signers of the note. Fristad, who was the cashier of the bank, took the note to respondent for his signature. It appears that with the continuing of the bank's business, a hope of success attending, there was expectation that the stock which was being provided for under the order of assessment referred to in the statement of facts and as disclosed to re-

spondent could probably be readily sold a little later and when sold the proceeds used to pay the note. There may have been more faith in the bank's management than was justified, but if so it was not created by anything occurring in the negotiations leading up to the signing of the note. It was of more ancient origin than that. It had endured for many years. In spite of a number of heavy assessments to restore impaired capital, the faithful stockholders, to the limit of their ability, responded to each succeeding call for more money from 1921 to 1929, and the respondent and others finally joined in a last plan which has but further involved them. Transactions which were purely in relation to the bank's affairs are treated as matters of suspicion, and the trial court found that Fristad and Stallard conspired together and by fraud and concealment and by false representations secured the note from respondent, saying: "It may not have been for any special benefit to themselves, but it was fraud nevertheless, even if done for the purpose of saving the depositors in the bank;" and considerable significance is attached to the facts that Stallard, Fristad, and Waters were identified with both institutions.

As has already been suggested, corporations are not involved in each other's affairs simply because they have common officers, but they are created by law for practical purposes and are permitted to make contracts with individuals and other corporations. The theory of the separate existence of a corporation distinct from its members and officers makes it possible for a corporation to do business with others even though it has in its employ or its organization officers and directors who may bear a similar relation to the others. 1 Page, Contracts, § 416. When such a situation exists and the transaction is open, honest, and fair, there exists no reason for penalizing a creditor of a bank for loaning to the bank its money and arranging therefor with the agent of the bank, even though such agent be also an officer of the corporation advancing the money.

There is reason to believe the respondent understood the difficulties which were being encountered by the bank and its stockholders and that his attitude now reflects a disappointment because of an ultimate and sorry result more than because of deceit practiced at the time. The prospects of promises if fulfilled led him to conclude that the bank would continue in business, and that the stock could be sold and the note paid without a sacrifice of his personal funds. He doubtless acted in the same belief and in response to the same impulses at this time as he did formerly when advancing the $7,600 he had already paid into the bank for stock and assessments under the same management. But notwithstanding, whatever impression one may form for or against this view, the evidence shows conclusively that respondent was dealing with Fristad as cashier of the bank for the sole purpose of arranging matters so "the bank could run." As we have said, the respondent had paid his assessment and the evidence shows his concern over the affairs of the bank. He says: "At the time I signed the note Fristad came up to my house; he said they could borrow the money from the insurance company if some of the stockholders would sign a note. . . . He told me they could not collect from some of the stockholders. . . . He told me some of the stockholders could not pay. He said they needed $5,000, and if they could get it they could run. . . . He didn't say the bank had signed the note or would sign the note. . . ." The fact that large sums raised by preceding assessments had not proved equal to making the bank an inviting investment certainly was known to respondent. It is clear that the only hope for it was bound up in the future and the loan to be secured was the sole means of securing the opportunity for these hopes to develop. The appellant and the bank had individual, separate, and adverse interests. The loyalty and good faith that characterize the duty and fix the obligations of an officer of a bank dealing with its stockholders do not so attach to the individual as

to affect another company which may have occasion to employ him in its matters. 2 Mechem, Agency, §§ 1815, 1817; *Lilly v. Hamilton Bank,* 178 Fed. 53, 29 L. R. A. N. s. 558. The interest of the appellant so far as the loan was concerned was not under the control or in the keeping of the bank officials. While a bank, under some circumstances, might be bound to respond in damages for certain failures of its officers in dealing with its stockholders, these consequences can hardly be visited on another company which was dealing through its own representative with the bank and certain stockholders.

In the findings of fact made by the trial court there are many items of interest which show the plan of the bank to save itself from being closed under the order of the commissioner of banking. A considerable portion of the assessment had been paid in, and, as the cashier told respondent, they were able to arrange matters so that all that was needed to keep the bank open and running was $5,000.

It was found by the trial court that the assessment had not been paid on 102 shares of stock at the time of the signing of the note. B. J. Stallard had standing in his name fifty-eight shares and there were forty-four other shares on which the assessment had not been paid. But the evidence shows that Fristad paid assessment on stock already held by him, and on February 1, 1929, he purchased twenty-nine additional shares and paid $2,900 into the bank on account thereof, and the balance of the stock was distributed or taken up, by Stallard three shares, and Stallard's two boys ten shares each. For the making of these arrangements to meet the levy of the assessment and to provide for the readjustment necessary in the effort to accomplish the sustaining of the bank the appellant is in no way responsible. The cashier of the bank approached the appellant with a proposition by which the bank officials

hoped they would be enabled to place at the disposal of the bank the required $5,000. This first proposition was not acceptable because it entailed a risk that appellant could not and would not assume. An alternative was suggested of loaning the money on the note signed by responsible individuals interested in the bank who were to pledge fifty shares of the bank stock or other security for the loan. It was in an effort to meet the requirements of this alternative that the cashier of the bank conferred with respondent and the other signers, and in conversation with respondent told him those things related by respondent and quoted above. The effect of this conversation must have been to disclose to respondent, who already knew much concerning the state of affairs, the plan and purpose which Fristad was carrying out for the benefit of the bank and its stockholders. The appellant had stated to the representative of the bank the terms on which it could make the loan; the representative of the bank in turn related these to the respondent.

It is true the appellant was a large depositor in the bank. Evidently influenced by this fact, it was willing to make a loan contrary to its usual course and referred the matter to its attorney for consideration. The interest of each corporation had a distinct and different origin and the interest of each has continued to be separate and adverse.

The bank was not a party to the note as the respondent claims he understood it was to be. Money was being raised in the bank's interest and for its benefit because it had too few assets and too many liabilities. Every one conversant with its affairs knew that unless the difference between the assets and the liabilities could be measurably lessened the bank must close. This was very apparent and required making the assessment. It probably would have accomplished nothing and certainly would have been a fraud on all concerned to have the bank assume this liability. The bank's officials were securing money from appellant on the

note which was to be collateralized by stock, for which stock it was hoped there would be a market in the spring or summer. From the sale expected to be made the note was to be paid. The plan and method outlined by the cashier of the bank to the signers of the note appears as disclosed by the testimony to have been carried out except the single matter of establishing a market and selling the stock. This left the note unpaid and due. While, as said, some details were not worked out at the time of the signing of the note, they were completed in accordance with the understanding and the $5,000 loaned by the appellant was used in the manner the respondent understood it was to be used. If under the evidence fraud and misrepresentation can be said to exist, it was not committed by the appellant or any one representing it, and it does not affect appellant's right to recover this $5,000 from those on whose credit it loaned the money.

The trial court erred in concluding that deceit and concealment and false representations were chargeable to appellant. It appears that all transactions with relation to the assessment, the arrangement for a distribution of the stock, and the cancellation of stock complained of, were all acts of the bank or Stallard and Fristad, and under the rules which obtain in cases of common officers and dual agency were not acts of appellant.

*By the Court.*—Judgment in favor of the respondent is reversed, and the cause remanded with directions to enter judgment against respondent in favor of appellant for the amount due on the note.

FRITZ, J., dissents.