FIDELITY & CASUALTY COMPANY OF NEW YORK, Appellant,
vs. MARYLAND CASUALTY COMPANY, imp., Respondent.

*June 3—June 22, 1936.*

For the appellant there was a brief by *Hill, Miller & Hill* of Baraboo, and oral argument by *James H. Hill.*

For the respondent there was a brief by *Coleman & Barry,* attorneys, and *James E. Coleman* of counsel, all of Milwaukee, and oral argument by *Mr. Coleman.*

WICKHEM, J.  Between the dates of December 12, 1929, and November 20, 1930, inclusive, defendant Hart was serving in several fiduciary positions.  He was executor of the will of August Stageman, and defendant Maryland Casualty Company was his surety.  He was also executor of the estates of Dorcas DuBois and Bira H. Brintnall.  He was administrator of the estates of Herman Pruess, Jacob Dietzman, and Ben M. Benson.  The plaintiff, Fidelity & Casualty Company, was surety upon his bond in the Benson and DuBois estates. Hart was also treasurer of school district No. 6 of the city of Elroy, and president of the State Bank of Elroy.  He carried in the State Bank of Elroy a separate account in the name of each estate by himself as executor or administrator, and also one as treasurer of the school district.  In addition to these, he carried an account as "John E. Hart, personal."

The transactions giving rise to this controversy are somewhat complicated, and we see no escape from the necessity of setting forth the transactions in considerable detail.

Some time prior to December 12, 1929, Hart had in his possession as executor of the Stageman estate a certificate of deposit in favor of August Stageman issued by the State Bank of Wonewoc in the amount of $3,100. With accrued interest this certificate amounted to $3,349.50. This was indorsed by Hart and delivered to the State Bank of Elroy for collection. It was collected and the proceeds credited to the Bank of Elroy. On the date of its deposit for collection, Hart credited his account as treasurer of the school district with the sum of $600; his account as administrator of the Pruess estate with the sum of $2,459.07; and opened a checking account as executor of the August Stageman estate, depositing in that estate the sum of $290.43. He thus deposited the entire proceeds of the certificate of deposit. This closes the first stage of the transaction. As a matter of bookkeeping, and disregarding for the moment any legal consequences, the result was that on the books of the bank the proceeds of the certificate belonging to the Stageman estate (with the exception of the small balance used to open a checking account for the Stageman estate) appeared to have been deposited by Hart to the use of the school district and the Pruess estate. On October 24, 1930, Hart withdrew $2,500 from the Stageman estate by means of a debit slip signed by himself, and on the same day deposited to his credit as treasurer of the school district the sum of $2,500. On November 18, 1930, Hart petitioned the county court of Juneau county, as executor of the estate of August Stageman, to pay to the three legatees named in the will specific legacies amounting to $9,000, less inheritance tax and amounts owing to the estate by one of the legatees. The net amount due to the three legatees was $8,079.07. Hart had on hand another certificate of deposit in the Stageman estate which with interest amounted to

$3,180. The checking account of the estate on that day amounted to $192.39. He was therefore short the sum of $4,899.07 of the amount needed to pay the legatees. To make up this amount, he withdrew from the Dietzman estate the sum of $2,500; from the Benson estate $646.51; from the DuBois estate, $600. He then cashed the certificate belonging to the Stageman estate amounting to $3,180, and three certificates belonging to the Brintnall estate in the sums of $307.50, $615, and $230.06, respectively. With the proceeds he purchased three cashier's checks payable to the heirs of August Stageman in the total amount of $8,079.07. Neither the Benson nor DuBois estates were ever indebted to that of Stageman.

As surety for Hart in the DuBois and Benson estates, plaintiff was compelled to pay $600 to the former and $646.51 to the latter to make up the shortages arising out of this transaction. On November 18, 1930, Hart was required to have on hand in the Stageman estate the sum of $10,482.76, but when his account was determined he was found to be indebted to the estate in the sum of $687.02, and this shortage the defendant Maryland Casualty Company paid pursuant to an order of the court.

The plaintiff's action is grounded upon the theory that Hart embezzled funds of the Benson and DuBois estates in order to repair his defalcations as executor of the Stageman estate; that the moneys so embezzled went to reduce Hart's liability for prior embezzlements of funds belonging to the Stageman estate and to reduce the liability of the Maryland Casualty Company as Hart's surety in this estate; and that plaintiff is entitled to be subrogated to the rights of the Stageman heirs and to recover from the defendant company to the same extent that they would have been entitled had they not been paid.

The contentions of defendant, which were approved by the trial court, were: (1) That the Bank of Elroy received the

original certificate belonging to the Stageman estate for collection with knowledge that it constituted trust funds of the Stageman estate; (2) that since the bank received the certificate of deposit for collection with notice of the fact that its proceeds belonged to the Stageman estate, the proceeds were impressed with a trust in favor of this estate, and no bookkeeping entries crediting portions of these funds to other estates had any legal materiality; (3) that in spite of the apparent distribution of the proceeds of this certificate (except the $290.43 credited to the Stageman estate), the bank remained liable to the Stageman estate for the entire amount· of the certificate, and that the various manipulations of Hart in no way affected this liability or constituted an embezzlement by him of funds from the Stageman estate; and (4) that the subsequent "withdrawal" of $2,500 from the Stageman account and "deposit" of same to the credit of the school district were mere fictitious entries or manipulations by bookkeeping and did not affect the liability of the bank to the Stageman estate. According to defendant's view, the bank remained liable to the Stageman estate in spite of these transactions, and when it·finally paid to the Stageman estate the entire amount of its account, it paid out its own funds in discharge of its own liability to the estate. The same theory applied to the Benson and DuBois accounts leads to the conclusion that the bank remained liable to them in spite of the debit made to their account by Hart, and that there was actually no use of funds belonging to these estates to repair shortages by Hart in his account with the Stageman estate.

The matter is not without difficulty, but after careful consideration we are satisfied that the court below was in error. The difficulties peculiar to this case arise out of the fact that Hart, in addition to being executor or administrator of the estate in question, was also president of the bank, and that he personally handled all of the transactions. Except for this

circumstance, the consequences of which will ·hereafter be considered, we think that plaintiff is entitled to be subrogated to the rights of the Stageman heirs against Hart and his surety. In Restatement, Restitution and Unjust Enrichment (Proposed Final Draft), § 207, the rule is thus stated:

"Where a person wrongfully uses property of another in discharging an obligation of the wrongdoer to a third person or a lien held by a third person upon his property, the other is entitled to be subrogated to the rights which the third person had before the obligation or lien was discharged."

If Hart's earlier manipulation of the Stageman account actually constituted a spoliation of that estate, both he and his surety sustained a liability as of that time to the estate or its beneficiaries. This was discharged in part with moneys abstracted from the Benson and DuBois estates, provided his later manipulations are to be treated as something more than fictitious book entries. In other words, money belonging to these estates was wrongfully used by Hart to discharge his obligation to a third person, and the rule appears clearly to apply.

The question presented here is not the same as that considered by the court in *Newell v. Hadley,* 206 Mass. 335, 92 N. E. 507, 29 L. R. A. (N. S.) 908. There the trustee of two trusts, being in default to trust B as a result of conversion of its funds to his use, wrongfully appropriated the funds of trust A to the benefit of trust B, partly in discharge of debts of trust B and partly in payment to the beneficiaries of trust B. In an action in which it was sought by the successor trustee of trust B to recover· these funds from the successor trustee of trust A, the plaintiff was held not to be entitled to recover from the *cestuis* for the reason that the latter were *bona fide* purchasers without notice of the money paid to them. Plaintiff was allowed, however, to recover by operation of the doctrine of subrogation for moneys applied,

in discharge of debts of trust B. No claim is made here that the funds applied by Hart to the payment of the claims of the Stageman heirs can be recovered against them, and the *Newell Case* is an authority to the effect that no such recovery could be had. So far as the case holds that the successor trustee of trust A may be subrogated to the rights of creditors of trust B whose debts were paid by money wrongfully taken from trust A, it seems to support the doctrine as stated in the Restatement. Such criticism as has been made of the disposition of this branch of the *Newell Case* has been based upon the fact that the trustee was a defaulter to trust B in an amount equal or greater than the sums paid by him to creditors, and that under these circumstances plaintiff's equity was not superior to that of trust B or its beneficiaries. See 59 Univ. of Pa. Law Rev. 225; 25 Harv. Law Rev. 602. This criticism, whatever its merit, has no application in this case. Here it is not sought to hold the Stageman heirs by subrogating plaintiff to the rights of their creditors paid by Hart. Plaintiff simply seeks to occupy the position and have such advantages and remedies as the Stageman heirs would have had had the money embezzled not been repaid. We think it is plain upon principle and authority that plaintiff is entitled to this. *American Surety Co. v. State T. & S. Bank,* 218 Iowa, 1, 254 N. W. 338; *First Taxing District v. National Surety Co.* 97 Conn. 639, 118 Atl. 96, 26 A. L. R. 297; *Pittsburgh-Westmoreland Coal Co. v. Kerr,* 220 N. Y. 137, 115 N. E. 465.

Due, however, to Hart's dual relationship and the method of his manipulations, defendant contends: (1) That the bank was liable to all of these accounts; and (2) that the debit slip and bookkeeping entries did not affect this liability any more than the manipulation of a depositor's account by a dishonest bank employee ever affects the liability of the bank to the depositor.

We are unable to assent to these contentions. Hart, as executor and administrator, had the right to deal with these

funds, and the only liability of the bank would arise under sec. 112.01 (8), Stats.,— ·

". . . In situations where a bank in which there is deposited funds in the name of a fiduciary as such, pays a check with knowledge that the fiduciary was guilty of a breach of trust in drawing the check. The fact that the account is in the name of the trustee as such does not characterize the deposit as special, or indicate a trust relationship between the depositor and the bank." *Ruben v. Banking Comm.* 216 Wis. 98, 256 N. W. 712.

While Hart was also president of the bank and his knowledge ordinarily imputed to the bank, there is a well-recognized exception to this rule. In *Joslin v. National Reserve Ins. Co.* 201 Wis. 506, 230 N. W. 711, it is said:

"The rule that the principal is affected with knowledge acquired by the agent in the transaction to which his agency relates is based upon the duty of the agent to disclose to his principal all knowledge and information he possessed at the time, or acquired in relation to the subject matter of the agency, and the presumption is that he communicates it accordingly; but he cannot be expected to communicate information which, from his relation to the subject matter, he would not disclose; and where his relation to the previous transaction is such as would be sufficient to induce him to withhold the information the presumption of its communication is rebutted."

*Cole v. Getzinger,* 96 Wis. 559, 71 N. W. 75; *In re Plankinton Bank,* 87 Wis. 378, 58 N. W. 784; *Hathaway v. Arnold,* 157 Wis. 22, 30, 145 N. W. 780; *Swennes v. Citizens State Bank,* 170 Wis. 197, 199, 174 N. W. 457; *First Nat. Bank v. Okerstrom,* 196 Wis. 391, 220 N. W. 177; *Farmers Life Ins. Asso. v. Houghton,* 207 Wis. 357, 241 N. W. 352.

The rule of these cases is applicable here. When Hart deposited for collection the original certificate of deposit, the bank's duty was to account for the proceeds to him as executor. He could have taken the proceeds in cash, and had he done so, the bank's liability to him would have ended. He chose as a short cut to deposit the proceeds to the account of

estates other than that to which the proceeds beneficially belonged. In doing so he acted as executor, and the bank's liability for this misappropriation could only be based upon the imputation to the bank of the knowledge that Hart had of the wrongful character of this appropriation. Since he was acting in his own interest and under circumstances that rebut any likelihood of disclosure of the facts to the bank, we cannot assent to the conclusion that the bank was liable under sec. 112.01 (8). The same principles apply to the final stages of Hart's manipulations. While he employed the method of debit slips and bookkeeping entries to accomplish his results, he was acting as executor and administrator, and just as truly withdrew the funds of the Benson and DuBois estates as though he had had no official connection with the bank. When the transaction was closed, the bank no longer owed either estate the amount of these withdrawals and each was poorer by this sum. It follows that the Stageman estate was actually despoiled by Hart and that the deficit was made good by plaintiff as surety for the Benson and DuBois estates. Under these circumstances, the right of plaintiff to recover cannot be questioned. In support of its contention that Hart's activities consisted merely of fictitious entries which did not affect the rights of these estates against the bank, defendant cites *Cudahy v. Firer,* 215 Wis. 599, 255 N. W. 901, 904. This case is not in point for the reason that there the defaulting fiduciary was handling several funds for the same principal, and the manipulations of the funds to cover up an earlier embezzlement obviously have quite different legal consequences from those involved here.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for plaintiff in accordance with the demands of the complaint.

NELSON, J., dissents.