BELLE A. CURTIS, Appellee, v. MARY S. ARMAGAST and CLIFFORD ARMAGAST, Appellants, and JAMES D. ANDREWS and AETNA LIFE INSURANCE COMPANY, Appellees.

Real property: ACTION TO CANCEL CONVEYANCE: LIMITATIONS. An action in the courts of this state to cancel a conveyance of land located here on the ground of fraud, which conveyance was executed in a foreign state where both the grantor and grantee resided,

is not barred by reason of the fact that some available remedy involving personal liability respecting the subject of the action was barred in the foreign jurisdiction, as such actions are of a distinct character; and as full relief could not be granted in a foreign jurisdiction the plaintiff was under no obligation to pursue the less effective remedy there, notwithstanding the provisions of Code Section 3452.

**Same:** LACHES. An action to cancel a conveyance for fraud in its execution is not barred by laches, where the defendant was in no manner misled to his injury by the delay, and no equities had intervened.

**Fraudulent conveyances:** EVIDENCE: RES GESTAE. In a suit by an heir to set aside a conveyance of his deceased ancestor, on the ground of the fraud of the grantee, proof of the declarations of the grantor at and immediately before the conveyance is competent as part of the res gestae, as bearing on the mental condition of the grantor; and all the facts and circumstances attending the transaction, including those bearing on the mental condition of grantor, and the influences exerted in bringing about the conveyance may be shown.

**Same:** BURDEN OF PROOF: CONSTRUCTIVE FRAUD: CONFIDENTIAL RELATION. One seeking to cancel a deed on the ground of actual fraud has the burden of proof on that issue; but in cases of constructive fraud, which is such fraud as the law infers from the relationship of the parties or the circumstances surrounding them, regardless of any dishonesty of purpose, the party claiming the benefit has the burden of rebutting the presumption which the law implies by proof that the contract was fairly procured, without undue influence or other impeaching circumstance; and this rule applies particularly where one of the parties by reason of the relationship has obtained a dominating influence over the other.

**Same:** PARENT AND CHILD: UNDUE INFLUENCE: EVIDENCE. The conferring of benefits by a parent upon a child is presumptively valid; the presumption of invalidity in such cases only arises where the child has become the dominant personage in that relationship and the parent the dependent one. Thus where a son had been intrusted by his mother for many years with the management of practically her entire estate, and she had given him her savings for investment, lived with him and trusted him in everything, a conveyance of her real estate to him without consideration, or any agreement on his part to maintain her, was presumptively invalid, and the burden was upon the son to show that the conveyance was without undue influence and was the free, voluntary anl intelligent act of

the mother, as against her or those rightfully claiming through her.

**Same:** TRUSTS: CONFIDENTIAL RELATION: EVIDENCE. In this action 6 to set aside a voluntary conveyance from the mother to her son, the evidence is reviewed and held to show that the mother obtained the legal title to the land originally, free from any trust in favor of the son; that the conveyance from her to the son was not made in payment of any services rendered or for contributions to her support; and that the evidence is insufficient to overcome the presumption that the conveyance, owing to the confidential relation of the parties, was fraudulent and void.

Evans and Sherwin, JJ., dissenting.

*Appeal from Mills District Court.*—HON. A. B. THORNELL, Judge.

FRIDAY, DECEMBER 13, 1912.

ACTION in equity to set aside and cancel certain conveyances and to quiet title to land. There was a decree in the district court in favor of plaintiff, and the defendants Armagast appeal.—*Affirmed.*

*D. E. Whitfield* and *Smyth, Smith & Schall,* for appellants.

*John Y. Stone* and *Sullivan & Rait,* for appellee.

WEAVER, J.—The facts leading up to the controversy involve a family history covering a period of more than half a century, with a multitude of details concerning some of which there is no material dispute and very many others about which there is a radical divergence in the testimony. It is manifestly impracticable to embody in this opinion all the facts having more or less bearing upon the merits of such a controversy, and the best we can hope to do is to select so much of the material contained in the record as will fairly illustrate the nature of the claims we have to consider.

James D. Andrews, now deceased, over whose dealings with his mother, Margaret Andrews, this litigation has arisen, was born in the year 1837. The family, consisting of the father, mother, son (James D.), and two daughters (Jessie and Margaret), settled in Iowa City in the year 1850. Another son, Peter, appears to have left home and gone to California early in life. He died intestate and without lineal heirs before the transactions now in dispute. The father was intemperate and thriftless, and except for a small amount of money belonging to the mother they were without substantial means. A family relative was engaged in mercantile business at the little town of Solon near Iowa City, and in 1855 took the son, then about eighteen years old, into his service as a clerk or assistant. Shortly thereafter, at the request of James D., his mother arranged to purchase the business. The amount paid appears to have been between $1,000 and $2,000. A large part of the purchase price was represented by money which the seller was owing Mrs. Andrews, and the remainder was obtained by her from friends in Scotland. The entire purchase price was less than $2,000. It is the theory of the appellant that this purchase was made for James D., and that he became the owner of the business; but, according to the claim of the appellee, it was a joint adventure of the mother and son, she furnishing all the capital and giving her personal assistance in carrying on the enterprise. However this may be, it does appear that the family then removed to Solon, and there they conducted the store until 1857, when it was exchanged with one Pratt for about 1,340 acres of land in Mills county of this state. For some reason the title was taken temporarily in the name of James D. Andrews, but within a few days thereafter he conveyed 1,140 acres of the land to his mother. The other two hundred acres he conveyed to her at a later date; the deed reciting that it was intended to supply the place of one which had been made years before and lost without being recorded. After the store was disposed of, James D. attended school for a time, then entered

the employment of an express company, continuing therein until about the year 1871. Later he entered the customs service of the United States, in which he remained during the remainder of his life. His employment in these occupations removed him from Iowa, and he became a resident of New York. While still a young man at home, he insured his life for the benefit of his mother and kept the policy in force until his death. During his career he is shown to have been liberal with his mother and his sisters, who continued their home in Iowa, and from time to time contributed to their support and comfort. The sister Jessie never married. Margaret married, became widowed, and both lived in the same home with their mother. Margaret died in 1906 leaving the plaintiff herein her only surviving heir. James D. married in New York about the year 1871, after which his contributions to the support of the family in Iowa were for a time lessened or suspended; but it is due to him to say that he was at all times disposed to be helpful. About this time also the brother, Peter Andrews, to whom reference has been made, rendered some assistance to the family. In 1889 James D., being then a widower with two children, invited his mother and two sisters to make their home with him in New York. They did so and remained in his family until his death on May 19, 1900. Their place in the family was not that of entire financial dependence. Before leaving Iowa City they had enjoyed some income from the rental of rooms and had earned money to some extent in sewing and other employments. From such sources, from savings made from the contributions received from her sons, and doubtless to some extent from the tenants of the Mills county lands, the mother had accumulated a fund of $4,000. In the New York home they performed most of the domestic service and assisted in various ways in bearing the burden of family cares. It is true, however, that the son and brother was regarded by them as their principal stay and support, and his success in life and his business capacity, as well as the kindness he had exhibited toward them all from

his boyhood, justified this confidence and reliance on their part.

Returning now for a time to a consideration of the land in controversy, the record indicates that until about 1874 it remained uncultivated and unproductive of any substantial income. It does not appear who, if any one, looked after the property, or who paid the taxes thereon during this period. About the year mentioned Mrs. Andrews began to lease the premises to tenants. A few years later James D., visiting his mother, learning that some difference had arisen between her and a tenant, went to Mills county, and, having made some sort of a settlement of the matter, he thenceforth, with her consent, kept the business in charge and himself, through agents of his selection, attended to the leasing and the collecting of rents. According to the testimony of the sister Jessie, he thereafter began and continued sending his mother $50 per month. Whether this was intended as in the nature of a payment or accounting by him for the rents and profits of the land does not appear except as a matter of inference, which may or may not be justified from the circumstances we have mentioned. Some seven years after taking up her home with James D. in New York, Mrs. Andrews, then being about eighty-three years of age, made to him a warranty deed of the Iowa land for the expressed "consideration of one dollar and other valuable considerations." The circumstances under which this conveyance was made are involved in considerable obscurity. According to the story told by Jessie Andrews, her mother showed her the instrument before it was signed, saying it was something which James D. wished her to execute to give him the power to act for her about the land, but that she expressed a reluctance to do so, saying she wanted to keep it in her own power as long as she lived, expressing at the same time her willingness that James should do business for her and her confidence that he would do what was right. The witness says that she herself saw that the paper was a deed of some kind, but did not understand that

the effect of it would be to convey the property away. Some three days later Mrs. Andrews, accompanied by James and Jessie, went to the office of a notary, where the deed was executed and acknowledged. Testimony was admitted on the trial of statements by and conversations with Mrs. Andrews after this date to the effect that she had been led to sign the conveyance supposing it to be a power of attorney, and that she did not understand the true nature of the business until after the death of James. This statement is also rebutted by proof of other alleged statements by her of a very different import, indicating her full understanding of the conveyance she had made and expressing the utmost confidence in her son.

In the year 1898 James D. Andrews became a helpless paralytic, in which condition he lived about two years. While physically prostrate and speechless, it is shown that he retained his mental faculties, and by the use of various devices those who ministered to his wants learned to communicate with him. A few months before he died he executed a conveyance of the land to his son and daughter, his only children. This deed was not delivered, and on March 26, 1900, before his death in May of that year, he made and delivered to his daughter, Mary S. Armagast, as sole grantee, a warranty deed of the land for the expressed consideration of one dollar. His mother survived him until the year 1903, when she died intestate at the age of ninety years. The only heirs of said deceased are her daughter, Jessie L. Andrews, her granddaughter, Belle A. Curtis, only child of Margaret Andrews Gray, deceased, and her grandchildren James D. Andrews, Jr., and Mary S. Armagast, only children of James D. Andrews, deceased. On April 5, 1909, Belle A. Curtis, as heir to one-third of the estate left by her said grandmother, began this action alleging that the conveynce from Margaret Andrews to her son was obtained by fraud, and the title so procured was held by the grantee in trust for the grantor, and asking that a decree be entered accordingly, that said con-

veyance be conceled, and plaintiff adjudged the owner of a one-third part of the land, and that an accounting be ordered of rents and profits received by the defendants. To this action Mary S. Armagast appears and defends. She denies all allegations of fraud in the procurement of the deed. She alleges that Margaret Andrews not only understood the nature and effect of the conveyance, but that with her full knowledge and consent James D. Andrews, relying upon said deed, took full charge and control of the property claiming both in public and private the full beneficial ownership thereof and taking and using as his own all the rents and income derived therefrom. She further alleges that Margaret Gray, through whom plaintiff claims, knew of the conveyance to James D. Andrews and acquiesced therein without protest, and also knew and acquiesced in the conveyance by James D. Andrews to his daughter, who, as she knew, relying upon said conveyance, assumed full control of said premises as their rightful owner. Defendant further pleads that plaintiff's right of action, if any she ever had, has been barred by the statute of limitations of the state of New York and the statutes of Iowa. For a further answer she alleges that plaintiff has been guilty of laches in bringing her action, and is therefore estopped to demand or receive equitable relief. The issues were tried and submitted to the court, which entered a decree for plaintiff substantially as prayed.

I. We have first to inquire whether the plea of the statute of limitations is available to the defendant. The deed sought to be avoided or held to create a trust in favor of

1. REAL PROP-
ERTY: action
to cancel con-
veyance: limi-
tations.

Margaret Andrews and her heirs was made in New York. The grantee was then a resident of that state and continued to reside there until his death in 1900. The grantor also resided there from a date prior to the deed until her death in 1903. The appellants have at all times been residents there. The plaintiff has never been a resident of New York, but her mother, through whom she traces her claim

of title, did reside there from 1889 until her death in 1906. The property in controversy is real estate wholly within the jurisdiction of the state of Iowa. It is alleged in answer that under the statutes of New York "an action brought to procure a judgment other than for a sum of money on the ground of fraud, in a case formerly cognizable by the court of chancery," must be brought within six years after the cause of action accrued, but such cause shall not be deemed to have accrued until discovery by the plaintiff or by the person under whom he claims of the facts constituting the fraud. Proof of the New York statute does not appear to have been made upon the trial, but for the purposes of this appeal we may assume it to be as stated. The point urged by appellant is that, while it would not be competent for the courts of New York to entertain an action *in rem* for the recovery of the land in Iowa, it could take cognizance of an equitable action against one of its own citizens and compel him to do equity, although the subject-matter of the controversy be lands within the jurisdiction of another state. Relying on this principle, counsel argue that as plaintiff or those through whom she claims might have brought an action in New York against James D. Andrews in his lifetime or against Mary S. Armagast after she took the title, and upon proof of the alleged fraud could have had a decree compelling a reconveyance or restitution of the title, but failed to do so for more than six years, the bar of that statute may be pleaded to an action thereafter begun in this state.

Turning to our own statute we find a provision somewhat similar to the one alleged to prevail in New York but making the period five years. It is also provided that actions for the recovery of real property may be brought within ten years. Code, Section 3447. But the time during which a defendant is a nonresident of this state shall not be included in computing any of these limitations. Code, Section 3451. It is evident therefore that the statute of New York furnishes no defense to an action brought in this state, unless

the case comes within the scope of that other provision which reads as follows: "When a cause of action has been fully barred by the laws of any country where defendant has previously resided such bar is effective in this state except as to causes of action arising here." Code, Section 3452. That this statute is not applicable to the case before us will become clear upon a little reflection. It is conceded that the courts of New York are without jurisdiction to grant any relief in the premises except such as involves the personal liability or personal conduct of one found in that jurisdiction. For instance, they would entertain an action for the recovery of a personal judgment for damages although the controversy more or less involves the title to lands in another state. Having the parties within their jurisdiction, they could also to a certain extent compel them to do equity by executing proper conveyances or releases affecting titles to such lands and enforce their decrees so far as practicable by injunction or other appropriate writ; but such remedy is neither full nor complete. No court can properly assume to deal directly with land situate in a foreign jurisdiction. It cannot quiet title thereto, or establish or extinguish liens thereon, or restore possession, or cancel records, or afford many other forms of relief which affect primarily the *rem*. The prayer for relief in this case is that the deeds from Margaret Andrews to James D. Andrews and from James D. Andrews to Mary S. Armagast be canceled and expunged from the records of Mills county, that plaintiff be adjudged the owner of an undivided one-third of the property free from the lien of a mortgage placed upon the land by Mary S. Armagast, and for an accounting of rents and profits. She also asks a writ of possession in her favor and for general equitable relief.

That the New York courts would not and could not enforce a remedy of this nature would seem to need neither argument nor citation of authorities, but see *Gillett v. Hill*, 32 Iowa, 220; *Blackman v. Wright*, 96 Iowa, 541; *Carpenter*

*v. Strange,* 141 U. S. 87 (11 Sup. Ct. 960, 35 L. Ed. 640);
*Davis v. Headley,* 22 N. J. Eq. 115; *Short v. Galway,* 83
Ky. 501 (4 Am. St. Rep. 168); *Clarke v. Clarke,* 178 U. S.
186 (20 Sup. Ct. 873, 44 L. Ed. 1028); *Clarke's Appeal,* 70
Conn. 195 (39 Atl. 155); *Insurance Co. v. Bank,* 68 Ill. 348
*Fryer v. Myers* (Tex.) 13 S. W. 1025; *Wilson v. Braden,* 48
W. Va. 196 (36 S. E. 367); *Pritchard v. Henderson,* 2 Penne-
will (Del.) 553 (47 Atl. 376); *Courtney v. Henry,* 114 Ill.
App. 635. That plaintiff could have gone into the courts of
New York, and, having personal service upon the defendant,
there procured a decree or judgment requiring a reconvey-
ance of the land— a remedy operating solely *in personam*—
is no answer to the suggestion. Having a right of action in
this state, the only jurisdiction in which full and final relief
could be procured, she was not bound to pursue the less
effective remedy. And permitting such remedy to become
barred by the statute of a foreign state could not bar her
right to resort to another and more efficient remedy in this
jurisdiction and against which our own statute has inter-
posed no bar. The precedents cited by counsel for the most
part go no farther than to recognize the authority of a for-
eign court having jurisdiction of the persons to enter judg-
ment operating *in personam;* but none appear to hold that
failure to seek such relief affects in any manner the right of
the injured party to seek that relief which can be fully ad-
ministered only by the tribunals of the state where the prop-
erty is situated.

There is yet another reason why Code, Section 3452, is
inapplicable. The terms of that section expressly exclude
from its operation causes arising in this state. Now, while
the alleged wrong for which the prayer for relief is pre-
dicated was committed in New York, the cause of action for
the relief here demanded did not arise there. A cause of
action cannot be said to ''arise'' in any jurisdiction whose
courts cannot take cognizance of the complaint and admin-
ister appropriate relief. No matter where the alleged wrong-

ful act was done, if its harmful effects operate solely upon property and rights and titles subject to the exclusive jurisdiction and control of the courts of Iowa, then here, and not elsewhere, is the place where such cause of action arises. The defense of the statute of limitations cannot therefore be sustained.

Nor do we find any merit in the plea of laches. The appellants, so far as appears, have in no manner been misled to their injury by the delay in bringing suit, and no equities have intervened which require the court to hold the plaintiff estopped from pursuing the remedy she has chosen. *Hemphill v. Holford,* 88 Mich. 293 (50 N. W. 300).

2. SAME: laches.

II. Counsel argue with much force against the admissibility of statements alleged to have been made by Margaret Andrews and immediately before the execution of the conveyance by her to her son. We are of the opinion, however, that in the case presented by the record before us the testimony, or at least some of it, is competent. Ordinarily, of course, a deed or other writing cannot be impeached by proof of declarations of the grantor, but it is here the thory of the plaintiff's case that the instrument was obtained by fraud, actual or constructive; that by reason of the grantor's advanced age, her weakened powers, her want of business knowledge and experience, and her peculiar trust and confidence in her son, she was deceived as to the real nature of the transaction and did not comprehend or understand that she was parting with the beneficial ownership of the land. Upon an issue of that nature we incline to the view that evidence of her language and conduct with respect to that transaction at the time and immediately before it was consummated is competent both as *res gestae* and as bearing upon her mental condition. This has often been held where the validity of a will or of an alleged gift is under consideration. *Vannest v. Murphy,* 135 Iowa, 123; *Johnson v. John-*

3. FRAUDULENT
CONVEYANCES:
evidence: res
gestae.

*son,* 134 Iowa, 33; *Kah's Estate,* 136 Iowa, 119; *Manatt v. Scott,* 106 Iowa, 203; *Bever v. Spangler,* 93 Iowa, 576; *Mulock v. Mulock,* 31 N. J. Eq. 594; *Sanderlin v. Sanderlin,* 24 Ga. 583; *Garnsey v. Mundy,* 24 N. J. Eq. 243.

The record in this case tends to support the conclusion that the deed to James D. Andrews was made without any present valuable consideration and, if valid, was in the nature of a gift or ante mortem disposition of the principal part of the grantor's estate, and we see no reason why the court may not inquire into all the circumstances attending the transaction, including all matters of fact having any legitimate tendency to show the capacity of the giver and the influences, if any, leading her to make the gift. Upon the trial both parties availed themselves of the benefit of this rule to a very liberal extent, with the result that more or less of incompetent hearsay may be found in the record; but, when all this has been eliminated, considerable remains which may properly be considered.

III. Decision of the merits of this controversy involves the consideration of two questions: First, was the deed to James D. Andrews obtained by actual fraud? And, second, if not obtained by express or actual fraud, was it obtained by constructive fraud? Or, stated otherwise, was it obtained under circumstances which cast upon the grantee and those claiming under him the burden of an affirmative showing of entire good faith on his part and free, voluntary, and intelligent action on the part of the grantor?

4. SAME: burden of proof; constructive fraud: confidential relation.

Were the appeal to be disposed of upon answer to the first inquiry, we should have no serious hesitation in reversing the decision of the trial court. The burden of showing actual fraud is upon the party pleading it, and in our judgment plaintiff fails to make such a case. It is unnecessary for us to recite the evidence upon this issue. It is enough to say that no witness speaking of his or her own knowledge testifies to any misrepresentation, falsehood, or deceit on the part of

the son to persuade or mislead his mother into a conveyance of her land, and the court should not and cannot enter into the realm of conjecture to fasten that stigma upon him.

The other question is more difficult of solution. What is called "constructive fraud" does not necessarily negative integrity of purpose. *Lampman v. Lampman,* 118 Iowa, 140. It has been defined as "an act which the law declares fraudulent without inquiry into its motive." *McBroom v. Rives,* 1 Stew. (Ala.) 72. Or "such contracts or acts as, though not originating in any actual evil design or contrivance to perpetrate a fraud, yet by their tendency to deceive or mislead, or to violate confidence, are prohibited by law." Bouvier, Law Dictionary. It has also been said to be such fraud as "the law infers from the relationship of the parties or the circumstances by which they are surrounded, regardless of any actual dishonesty of purpose." 14 Am. & Eng. Ency. of Law (2d Ed.) 21.

The use of the phrase "constructive fraud" has frequently been severely criticised by the courts and lawwriters as being misleading and unscientific, but it has become so fixed in the literature and terminology of the law that any attempt to substitute a more fitting name for the thing to which it is applied would result in confusion. The necessity of considering this phase of the law arises most frequently in controversies which grow out of dealings between persons when one occupies fiduciary or confidential relations to the other. As between such persons, a contract by which the one having the advantage of position profits at the expense of the other will be held presumptively fraudulent and voidable, and the burden is placed upon him who claims the benefits thereof to rebut that presumption by an affirmative showing that such contract was fairly procured without undue influence or other circumstance tending to impeach its fairness. Though strictly of differing signification, the phrases "fiduciary relations" and "confidential relations" are ordinarily used as convertible terms and have reference to any

relationship of blood, business, friendship, or association in which the parties repose special trust and confidence in each other and are in a position to have and exercise, or do have and exercise, influence over each other.   The rule or presumption to which we have referred is more particularly applicable where one of the parties to such relation has by reason of his stronger character, greater ability, and wider experience, or by his hold upon the affection, trust, and confidence of the other, obtained a dominating influence over him.   The relationship of principal and agent, attorney and client, parent and child, guardian and ward, is frequently mentioned as illustrative examples, but fiduciary or confidential relations may exist under a great variety of circumstances.   Mr. Pomeroy states the general proposition as follows:  "The doctrine arises from the very conception and existence of a, fiduciary relation.   While equity does not deny the possibility of valid transactions between the parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption."   2 Pomeroy, Eq. (3d Ed.) section 956. In *Rodes v. Bate*, L. R. 1 Ch. 252, Turner, L. J., says:  "I take it to be a well-established principle of this court that persons standing in confidential relation toward others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the court that the persons by whom the benefits have been conferred had competent and independent advice in conferring them.  . . .   The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying that it ought to be applied whatever the nature of the confidence reposed or the relationship of the parties between whom it has subsisted.   I take the

principle to be one of universal application." After quoting this precedent, Mr. Pomeroy speaks of all those instances in which the two parties in confidential relation "consciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealing some conveyance, contract, or gift. To such cases the principle literally and directly applies. The transaction is not necessarily voidable, it may be valid; but a presumption of its invalidity arises which can only be overcome, if at all, by clear evidence of good faith, or full knowledge, and of independent consent and action." 3, Pom. Eq. (3d Ed.) section 957.

While the relation of parent and child is nearly always given as an illustration of confidential relations, it does not follow that all transactions between persons occupying that relation are presumptively invalid. Indeed, it may be said that as a general rule the conferring of benefits by a parent upon a child is presumptively valid. The unfavorable presumption arises only where the child, by reason of its youth and inexperience or other special circumstances, is to some degree under the dominion, control or paramount influence of the parent, or where the child is the dominant personage in that relationship and the parent has become the dependent one, trusting herself and her interests to his advice and guidance. *Mulock v. Mulock*, 31 N. J. Eq. 594; *Parker v. Parker* (N. J.) 5 Atl. 586; *White v. Daly* (N. J. Ch.) 58 Atl. 929; *Fitch v. Reiser*, 79 Iowa, 34; *Nobles v. Hutton*, 7 Cal. App. 14 (93 Pac. 289); *Gibson v. Hammang*, 63 Neb. 349 (88 N. W. 500); *Doyle v. Welch*, 100 Wis. 24 (75 N. W. 400); *Cole v. Getzinger*, 96 Wis. 559 (71 N. W. 75); *Mott v. Mott*, 49 N. J. Eq. 192 (22 Atl. 997).

5. SAME: parent and child: undue influence: evidence.

This is in no manner inconsistent with the undoubted right of parents to dispose of their estate as they may think best. They may by deed or will dispose of it to persons outside of the family, or may give it all to one or more of their

children and ignore the equal and perhaps superior rights of others. No presumption of fraud or undue influence arises from the mere fact that a mother exercises such right, or that she has preferred one child and left another unprovided for; but when, in addition to such a conveyance, under such circumstances it appears that she was at the time wholly dependent upon the grantee for advice, residing in his home and placing in his hands the management and control of all her business interests, and in all things manifesting her implicit confidence and trust in him, the taking of a conveyance of substantially all her estate without consideration and without any writing binding him to support her through life, there is a presumption of undue influence which equity will require the beneficiary of the transaction to rebut before his claim of title thus secured can be sustained against an attack by the grantor or by those who succeed to her rights. The rule is well stated in *Mott v. Mott,* 49 N. J. Eq. 192 (22 Atl. 997), as follows:

With reference to transactions between parent and child, the law presumes that the influence of the parent over the child during the tender years of infancy is so controlling that it regards transfers from child to the parent on arriving at majority or immediately thereafter as having been made under the influence of overweening confidence. As the child matures and acquires experience and independence, the presumption weakens and at last ceases. As the parent, however, advances in years, the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks to a son or daughter for advice and protection. The parent becomes the child with the same dependence, overweening confidence, and implicit acquiescence which had made the other in infancy the willing instrument of the other's desires. *Highberger* v. *Stiffler,* 21 Md. 338 (83 Am. Dec. 593); *Martin* v. *Martin,* 1 Heisk. 653; *Comstock* v. *Comstock,* 57 Barb. (N. Y.) 453; *Whelan* v. *Whelan,* 3 Cow. (N. Y.) 557. If, under such circumstances, a son obtains a conveyance from a parent, the court will not permit it to stand unless he establishes by

abundant proof that the contract was free and fair and made
with the utmost good faith.

In *Fitch v. Reiser*, 79 Iowa, 34, this court had to consider
a conveyance by an old man to his daughter, upon whom he
largely depended for advice and in whom he placed great
reliance. After considering the evidence, we said:

We are not prepared to say that the evidence shows an
absolute want of mental capacity to make a testamentary dis-
position of property. But in consideration of the extreme
mental weakness of the deceased at the time the deed was ex-
ecuted, and as the property in controversy embraced sub-
stantially all of his estate, and as the deed was without
consideration, and in view of the relation of trust and confi-
dence between the parties to the conveyance, we think the
learned district judge was right in entering a decree annulling
the deed. The control of the defendant over the deceased
appears to have been absolute. Under such circumstances, it
was incumbent upon the defendant to show that the con-
veyance was made voluntarily and without the exercise of any
influence on her part to procure the same.

In *Reese v. Shutte*, 133 Iowa, 682, the court, speaking
by Sherwin, J., said: "It is well settled that transactions of
this kind between an aged and infirm parent who has reposed
confidence and trust in the child will be closely scanned by
the court, and that the burden is on the grantee to show the
*bona fides* thereof." The same rule is approved in *Spargur
v. Hall*, 62 Iowa, 500. In *Davis v. Dean*, 66 Wis. 109 (26
N. W. 740), where a deed from mother to son was in question,
the court, after discussing the evidence of mental competency,
uses this language: "The transaction, if upheld, practically
disinherits her daughter and her other heirs. Assuming her
mental competency, this strange and unnatural disposition
of her property of itself strongly suggests the existence of
improper influence upon her mind." Of the burden of proof
the court further says: "The grantee has failed to satisfy
the requirements of the rule, and the presumption of injustice,

fraud, and wrong stand against the conveyances, which he must remove before the court is authorized to say that they are valid." The same rule is applied in *Barnard v. Gantz*, 140 N. Y. 249 (35 N. E. 430). Dealing with a conveyance from an aged mother to a son to whose hands she had intrusted all her business and upon whom she largely relied in all her affairs, the Illinois court has said:

A gift made by a parent to a child on account of the affection of the former for the latter, even where it is made at the solicitation of the child, is not the object of suspicion, and there is no presumption against its validity unless the relation between them is something more than the ordinary relation between parent and child. Where, however, the natural positions of the parties become reversed—where the parent defers to, trusts in, and yields to the child, when there exists between them what in law is termed a fiduciary relation in which the parent is dominated by the child, and where the child prepares or causes to be prepared and executed an instrument conveying to him property of the parent as a gift or upon a grossly inadequate consideration—the presumption arises that the transfer was obtained through undue influence, and the burden rests upon him to show that the conveyance was the result of full and free deliberation on the part of the parent. This is not peculiar to transactions where the parties are parent and child, but is the law in any case where a fiduciary relationship exists, where the conveyance is from the dependent to the dominant party, and where the donee or grantee prepares or procures the preparation and execution of the deed or other instrument; and the rule is applied under such circumstances wherever that relation exists, no matter whether the parties are related by blood or not. (*Rickman v. Meier*, 213 Ill. 507, 72 N. E. 1121.)

The rule of the cited cases has been very frequently affirmed and prevails in practically all the states. For example, in addition to the cases hereinbefore cited, see *Coffey v. Sullivan*, 63 N. J. Eq. 296 (49 Atl. 520); *Hensan v. Cooksey*, 237 Ill. 620 (86 N. E. 1107, 127 Am. St. Rep. 345); *Soberanes v. Soberanes*, 97 Cal. 145 (31 Pac. 910); *Brummond*

*v. Krause,* 8 N. D. 573 (80 N. W. 686); *Kerr on Fraud &
Mistake,* 150-152;. *Thorn v. Thorn,* 51 Mich. 167 (16 N. W.
324); *Parker v. Parker* (N. J.) 5 Atl. 586; *Bowe v. Bowe,*
42 Mich. 195 (3 N. W. 843); *Slack v. Rees,* 66 N. J. Eq. 447
(59 Atl. 466, 69 L. R. A. 393); *Hall v. Otterson,* 52 N. J. Eq.
528 (28 Atl. 907); *White v. Daly* (N. J. Ch.) 58 Atl. 929;
*Post v. Hagan,* 71 N. J. Eq. 234 (65 Atl. 1026, 124 Am. St.
Rep. 997); *Hattie v. Potter,* 54 Wash. 170 (102 Pac. 1023);
*Swanstrom v. Day,* 46 Misc. Rep. 311 (93 N. Y. Supp. 192);
*Couch v. Couch,* 148 Ala. 332 (42 South. 624); *Highberger
v. Stiffler,* 21 Md. 338 (83 Am. Dec. 593).

Under the rule upheld by these precedents, we think
there is no room for doubt that the burden in the case before
us is upon the defendants to affirmatively show that the deed
under which they claim was obtained without undue influence
and was the free, voluntary, intelligent, and unrestrained act
of the grantor.    James D. Andrews, the grantee, was not
merely the son of the grantor.    He was her agent, and for
nearly twenty years had been intrusted by her with the man-
agement of these lands comprising practically all her worldly
estate.    She had also placed in his hands a part of her small
savings for investment.    She was a member of his family
living under the same roof with him.    She unquestionably
regarded him with great affection and put implicit trust and
confidence in his ability and his purpose to do whatever was
right with respect to her property and property interests.
The deed which she made to him was absolute in form and
vested him with title to all the land—her entire estate—with-
out reservation or power of recall.    So far as appears, there
was no agreement or promise on his part to provide her main-
tenance or home for the remainder of her life.    Doubtless
he expected to do so; but, legally speaking, there was no reason
why he might not on the next day decline to render her further
support.    What is still more to the point, no thought appears
to have been taken of the possibility that his mother might
outlive him, as in fact she did, and that in such case the

land which had been her safe security against want would pass wholly to his heirs without the slightest obligation on their part to keep or care for her except by way of charity. And all this was given without valuable consideration to the son occupying the closest confidential and fiduciary relation to her and to the exclusion of her two surviving daughters.

Among all the very many cases in which a child has been held to the burden of negativing presumptive fraud or inference of undue influence in the procurement of an advantageous contract from a parent, it will be difficult to select any in which the showing is stronger than the one here presented. As we have already shown, it is not necessary to the application of this rule that the court should find or presume an actual intent upon the part of the son to wrong his mother. Indeed, if there were any such actual intent, the fraud would be express and not constructive. He had so long had a free hand in managing the land that he doubtless felt something akin to a sense of proprietorship. The evidence tends to show that in conversation with strangers and third persons he was in the habit of speaking of the property as his own. His mother and sisters were evidently women of simple tastes and habits, living in his family, and we may presume that he expected to continue to provide for them. Under such circumstances, it would perhaps be natural and evince no moral turpitude on his part if he secured from her the title to the land so long as he was willing to give to her and his sisters the one substantial benefit they could derive from its ownership—a home and the supply of their reasonable personal wants. But the end which the principle which we have been discussing is intended to promote may not be defeated by a showing of good intentions. The rule has not been formulated to punish active or premeditated wrong, but to close the door against resulting wrong. In the very nature of the situation, where the parties occupy such intimate relations, it is rarely, if ever, possible to prove the extent to which the weaker or dependent party's action has been influenced

528 CURTIS v. ARMAGAST. [158 Iowa

by that relationship; hence the burden is properly placed upon him who has profited thereby to make an affirmative showing, not merely of good faith on his part, but of absolute freedom of intelligent action on the part of the grantor. The New Jersey court goes to the extent of holding that every conveyance from an aged and dependent parent to a child occupying a relation of trust and confidence will be invalidated unless in making it the parent has had the benefit of competent independent advice on the subject. *Slack v. Rees,* 66 N. J. Eq. 447 (59 Atl. 466, 69 L. R. A. 393) ; *Post v. Hagan,* 71 N. J. Eq. 234 (65 Atl. 1026, 124 Am. St. Rep. 997) ; *Baur v. Cron,* 71 N. J. Eq. 743 (66 Atl. 585) ; *Hall v. Otterson,* 52 N. J. Eq. 528 (28 Atl. 907). See, to the same effect, *Rodes v. Bate,* L. R. 1. Ch. 252, and 3 Pom. Eq. (3d Ed.) section 957. In *Post v. Hagan, supra,* the court defines "proper independent advice" to mean that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of his proposed benefaction." It is probably not necessary for us in this case to go to the full extent of the precedents here cited, but it may be said they discuss and defend the principle so announced with logical force and clearness.

With evident appreciation of the rule we have here affirmed as to the burden of proof in support of a conveyance in the nature of a gift to one who holds a confidential or fiduciary relation to the grantor, counsel for appellants argue that in the case at bar James D. Andrews was at all times the beneficial owner of the land, that the mother held the legal title as a trustee for his benefit, and that in conveying it to him she was only vesting him with that which was already equitably his own. But this claim is without basis in the record. In-

6. SAME: trusts: confidential relation: evidence.

deed, even if the burden upon this question were upon the appellee—and of course it is not—we should have to say that the evidence shows beyond all reasonable question that at the date of the deed to her son Margaret Andrews was both in law and in equity the absolute owner of this property. So far as appears, James D. Andrews never invested a dollar in its purchase. The stock of goods exchanged for it was paid for with the mother's money, and, while for some reason not shown the title to the land was at first conveyed to the son, he almost immediately conveyed it to his mother, in whom it rested for nearly forty years. It also affirmatively appears that some fifteen years or more after the title had been vested in Margaret Andrews a judgment creditor of James D. Andrews, claiming that the latter was in fact the owner of the land, or of some of it, undertook to subject it to the payment of his claim. Thereupon the mother brought an action in equity to enjoin the sale. Upon trial of the cause both mother and son testified by deposition in support of her title, and she was found to be the true owner and the sale permanently enjoined. So far as the record shows, James D. Andrews never exercised or claimed any right in or authority over the land until about the year 1878, when, as we have before mentioned, in visiting the family in Iowa he went to Mills county and settled some dispute which had arisen between his mother and her tenant or agent, after which, apparently at her request, he continued in the management of the property. Except statements alleged to have been made by him to persons outside of the family, there is no evidence that he ever denied the absolute character of his mother's title or claimed ownership in himself. In short, all the competent testimony having any bearing on that question tends to support the presumption of ownership attaching to the legal title which for more than a generation confessedly stood in Mrs. Andrews.

Again, it is strenuously argued that this conveyance was but the natural and proper recognition by Mrs. Andrews of

the indebtedness of herself and family to James for his serv-
ices and contributions in the matter of their support. It is no
disparagement of the filial loyalty and kindness of James
D. Andrews, which all admit, to say that this argument is
somewhat overwrought. He was undoubtedly a helpful son.
He was active, industrious, and within the range of his earn-
ing capacity, was from boyhood liberal in assisting the family.
But they were not wholly dependent upon him or upon his
ability to make such contributions from his salary, which
was necessarily restricted. The only witness in position to
speak from personal knowledge estimates the help furnished
by him up to the time of his marriage in 1871 at from
$150 to $200 per year. After his marriage his own increased
cost of living appears to have interrupted his contributions to
his mother until about 1878, when he took over the manage-
ment of the land, from which date to 1889, when she went to
live with him, his remittances were about $50 per month.
Thereafter his assistance to her and his sisters was limited
to the supply of their needs as members of his family, for
which service on his part there was at least partial return of
value in their services to him and his family. Computing his
contributions at the highest estimate from 1857, when he was
a boy of twenty years until 1889, when the family was reunited
in his New York home, their aggregate will not exceed $10,000.
On the other hand, the rental value of the land from 1878
to 1896 is shown to have been $2,000 to $2,500 per year, or
an aggregate for eighteen years of $36,000 to $47,000, and, if
we add thereto the estimate for the four years between the
date of the deed and the death of James D. Andrews, the aggre-
gate will be increased to $44,000 to $49,000. How much of this
was actually realized above expense and taxes we do not
know, for no account has been exhibited; but it is shown that
the entire tract is fair average Iowa land, all under cultiva-
tion, and that for a period of seven years Mrs. Armagast
has secured therefrom an aggregate net income of $22,555.82.
It is therefore reasonably clear that, conceding to James D.

Andrews full and deserved credit for the care manifested and the expense incurred by him on account of his mother and sisters, he had received in return financial benefits far in excess of the benefits conferred by him.

We have left therefore only to consider whether the evidence offered in support of the defense sufficiently sustains the burden of proof as to the validity of the deed. This in our judgment must be answered in the negative. We may further add that such must be our conclusion even if we eliminate from the record all the testimony offered by the plaintiff concerning the alleged declarations of Mrs. Andrews. It does sufficiently appear that the deed was prepared and executed at the request or by the procurement of James D. Andrews, that it was wholly without valuable consideration, that it conveyed to him with no power of revocation on her part the mother's entire estate without any provision or binding legal obligation of the son for her support or for the support of her daughters, and that at the date of such transfer the son receiving such valuable gift was her agent and the sole manager of her property interests. It further appears, as we have already shown, that at this time she was eighty-three years of age, with at most no more than an average mental strength, which is normal in persons of her years, that she was an inmate of the son's family and depended upon him with entire faith and confidence in his judgment and fidelity. The defendants made no affirmative showing whatever of the conversations or negotiations between mother and son or of the promises or undertakings, if any, on his part. They do offer evidence of witnesses to the execution of the deed that the grantor appeared to be of sound mind and to have an intelligent conception of what she was doing, but this falls far short of negativing the presumption or inference of undue influence. In a large majority of the cases hereinbefore cited the mental capacity of the grantor to make a valid conveyance is conceded, but it is universally held that this showing does not of itself fill the requirements of the

rule.   It is at this point that there is a marked failure of proof which requires an affirmance of the decree of the district court.

The importance of the interests involved in the controversy and of the rules of law upon which the decision depends is our only apology for the unusual length to which we have pursued its discussion.

The appeal cannot be sustained, and the decree below is *Affirmed*.


EVANS, J. (dissenting).—I am unable to concur in the majority opinion.   After a careful study of the record herein, I cannot avoid the conclusion that the merits of the case are with the defendant.   The majority opinion is made to rest upon the theory of constructive fraud, in that fiduciary relations existed between the parties to the deed at the time of its execution, and that the burden is upon the defendant to support the deed with extrinsic evidence and to rebut thereby a legal presumption of fraud.   As to the general proposition of law thus set forth in the majority opinion, I make no controversy.   As applied to this record, however, such proposition is perhaps overemphasized in the majority opinion, and I am inclined to make that criticism upon it.   The deed under consideration is an old one.   Both parties to it were dead many years before this action was brought.   Direct evidence from the parties themselves is therefore impossible.   The extrinsic evidence upon which the defendant must necessarily rely is largely circumstantial and is to be found in the history of the family, extending over a period of forty years.   This history is succinctly stated, in the main, in the majority opinion. I will avoid repetition as much as possible, but I cannot wholly avoid it without rendering my own statement unduly disconnected.

In 1857 the Andrews family consisted of the parents and the son, James D., and the daughters, Jessie and Margaret.   The father was a drunkard and of no assistance to

his family. He died in the early sixties. The son James D. was born in 1837. Margaret was older and Jessie was younger. Margaret was married in 1850 to one Gray, but was later separated from her husband. She had one child born in 1856, named Belle, and she is the plaintiff herein. She also was a member of the Andrews family. Her mother is known in this record as Margaret Gray, her aunt as Jessie Andrews, and her grandmother as Margaret Andrews Prior to 1857, Margaret Andrews and her son James D. had engaged in an enterprise of storekeeping at Solon, which lasted for a couple of years or more. The store was traded for the land in controversy, and other land. The land was cheap and unproductive; the family was poor. In 1857, James D. left home and obtained employment. The financial relations between him and his mother and his sisters began at this point. The only living witness who has personal knowledge of these matters is the sister Jessie. She was a witness on behalf of the plaintiff. She is interested adversely to the defendant in precisely the same manner that the plaintiff is. The greater part of her testimony is incompetent under the provisions of section 4604, but I shall spend no time upon that question in this dissent. Notwithstanding her adverse interest, her testimony discloses a state of facts which tends strongly to support the transaction now under attack.

Beginning in 1857, James D. sent of his wages to his mother and sister from $150 to $200 every year until he was married in 1871. It is said by Jessie that his contributions ceased during his married life. But his married life was very brief; his wife dying in 1874, leaving him with two children, a son and a daughter. At this time, James D. was in the government service in New York City. He continued his benefactions and visited his mother and sisters often. In 1879 the farm began to pay a revenue, and he looked after it through a resident agent. It is assumed in the majority opinion that James D. got the benefit of the

use of this farm for himself. This assumption is based wholly upon an estimate of the witness Jessie that he sent his mother about $50 a month. The record shows quite satisfactorily that the mother and sisters had complete knowledge concerning all revenues from the farm, and that whatever was done was recognized by all of them as just and proper. This appears from some letters in the record written by Jessie herself in the eighties. In the early sixties, James took out a life insurance policy for $10,000 in favor of his mother and kept it in force throughout his life.

In 1889 he invited his mother and sisters to come to New York and make their home with him. Such arrangement was entered into. The family at Iowa City at that time consisted of the mother and two daughters and Mabel Stuart, a daughter of the plaintiff herein by her first marriage. James D. rented a residence near Sheepshead Bay, which was occupied by the family until it was broken up by death. It is urged in appellee's argument and somewhat assumed in the majority opinion that this invitation was extended by James D. for his own advantage and in order to obtain the help of his mother and sisters in taking care of his own children. The record warrants no such assumption. His children were already quite grown up and were away at school. The oldest, the daughter (now Armagast, the defendant herein), had attained her majority. The son became engaged in business and never made his home there after such date. Prior to 1889 James D. had already become a mere boarder. It is too plain for argument that the home thus provided operated greatly to the advantage of the mother and sisters and the niece Mabel. The services rendered by the mother and daughters which is much paraded in argument was a service principally to themselves. Jessie testified on this subject as follows:

The circumstances under which the family moved to Brooklyn were these: My brother had his two children in

school.  He was boarding.  He asked me to come on and stay
with his daughter Mary.  She wished to attend some concerts
down at Brighton Beach.  I spent the summer of 1888 with
him.  The next summer she came out and stayed with us.
Her father came after her.  He asked Mother if she would
not come to New York and keep house for him.  He was tired
living in a boarding house.  He was going to build a house.
The family moved to Brooklyn on his solicitation.  He was
boarding, and he wanted a home for his children.  He thought
it would be nice for us all to be together.  He only hesitated
on account of Mother's age, for fear she might not like the
change; but she was willing to go.  We were to live with him
as one family.  He expected to build a house for us.  One
inducement was that my sister was very fond of flowers, and
he was planning a greenhouse for her.  We removed to Brook-
lyn in November, 1889.  He advanced the money to go there.
Mabel Stuart went with us.  She was Mrs. Gray's grand-
daughter, and the daughter of Mrs. Curtis, the plaintiff.  She
was a member of our family at the time we removed to Brook-
lyn.  Her mother was living in Omaha part of the time and
part of the time in St. Paul.  Mrs. Curtis was unfortunate in
her first marriage and left her husband.  She had to go to
work.  She was a stenographer and held a very good position,
but left Mabel with us.  I wrote to my brother before going to
New York and asked him how it would be about Mabel coming.
Mrs. Gray thought perhaps there would be objection to it.
He wrote back that she was perfectly welcome to come with
the rest of us.  I do not think Mother would have gone to
New York without Mabel.  Mabel was then eight years old
and had lived in the family four years.  My sister and I did
most of the work of the family.  My brother's two children
were in school.  Mabel was in school and Mother was not able
to do very much work.  We never had any servant except a
woman in to wash two or three times during that time.  His
daughter did some sewing for herself after she was out of
school.  Aside from my board, I do not think I ever got more
than $50 in money; that is, $50 a year.  It did not cover the
expense of my clothes.  Some of those were given to me.  The
cost to my brother for our clothes I could hardly say.  We
did not have such a lot of clothes.  We made them ourselves.
I think, to take it on an average, it would not be more than
$100 a year for me.  Mrs. Gray got a little more than I did.

I do not know whether she got more than $100 a year or not. Mother required very little. He looked after us all as my father would look after his children. He always seemed like a father to me. He always seemed to regard us with love.

James D. was not a man of wealth. At the time of his death he had been in the government service for a great many years, beginning with a salary of $1,500, which had been increased to $2,400 in the last ten years of his life. This was the highest salary he had ever received. It is the testimony of Jessie that he bore every expense of every kind for the family. It goes without saying that he could not bear such expense out of a salary of $2,400, and it may be fairly assumed that the proceeds of the farm were devoted to that end. The farm was in the mother's name. I shall assume for the purpose of this dissent that it belonged to her both legally and equitably, although it was once in the name of James D. and was conveyed to his mother while he was yet a minor. But I can entertain no reasonable doubt upon this record but what it was the understanding of the family that James D. was to have this land. But for his contributions for more than twenty years this land could not have been kept in the family. On October 8, 1896, the mother conveyed this land to her son James D. According to Jessie's testimony, the mother talked with her about it and showed her the deed before she signed it. She signed the deed in the absence of James D. and in the presence of Jessie alone. She not only signed it, but she wrote her name in its appropriate blank space in the body of the deed. It was two or three days after she signed it before she went to the city to acknowledge it. It was acknowledged and witnessed in a formal manner. The witnesses to the deed have both testified as witnesses herein. Jessie was present with her mother. There was nothing in the conduct of the parties to attract the particular attention of the witnesses. It is shown practically without dispute that the mother, although eighty-three years of age, was

remarkably bright and intelligent and well preserved. She lived for seven years thereafter. She was not lacking in practical business experience. She had not only engaged in a store business in an early day, but she was also the postmistress of Solon. When she came to New York in 1889, she brought with her a little over $4,000 which she had saved out of her son's remittances. During her entire stay with her son she kept that as a fund for herself, spending none of it. Her habits of consultation on business matters are described by Jessie as follows: "Q. To whom did she go for advice and consultation in regard to any matters in which she was interested during the time she was in New York. A. My brother, and *she talked things over with me always*. Q. What were the relations between her and your brother? A. The very best, always."

There was no secrecy about the execution of the deed. It was known to each member of the family. Considering the age of the mother, the sisters, Jessie and Margaret, might well have deemed their interests affected by such a transaction. The fact that these never questioned it in any way, but acquiesced in it, as a matter of course, is a strong circumstance indicating that the conveyance was in full accord with the family understanding. That this continued to be the state of mind of Jessie for many years after her mother's death is indicated by a letter written by her in August, 1907, from which I quote as follows: "When mother deeded the land to by brother, she was not obliged to do so by law, but from a sense of justice for what he had done for her. He promised many things. My sister and I were to have a home and enough to keep us. We had nothing in writing, and I do not think he dreamed but what we would be all right. As far as I am concerned I want nothing, but my sister left a daughter who has to be kept." Going back for the moment to their early experience, the record contains a letter written in 1865 by Margaret Gray, the mother of the plaintiff, under whom plaintiff claims. I quote the following reference

therein to her brother James: "My brother did not get home until after the funeral. There are very few young men like him. He has supported the family for several years. He is surely one of earth's noblemen. My husband died four years ago the first of last January. I have a little girl eight years old. She has always been very sickly, but is getting better now. My sister Jessie is quite a large girl and is on the fair way to be a good scholar. My brother is going to give her a good education." · The plaintiff herself testifies on that subject as follows:· "Up to the time of my marriage as far back as my recollection goes, I always lived in the family of my grandmother. It was a matter of common knowledge that James D. Andrews was assisting in the support of the family. That is so as far back as I can recollect." .Since the writing of that letter, the granddaughter Mabel, the daughter of the present plaintiff, came into the family. The history of Mabel is recited by Jessie in her testimony as follows: "She had a daughter, Mabel, who was born in 1881. Mabel came into our home when Mrs. Curtis left her husband. She was then about three or four years old, and she continued to make her home with us. She went to New York with us, was educated, and her support and education was contributed to by James D., the same as he contributed to the support of myself, my mother, and Mrs. Gray. Mabel had no property of her own. After she went to New York, her mother sent her some boxes of clothing. Aside from this, she was raised, educated, and clothed by James D." Her mother, the plaintiff herein, gives it as follows: "My mother had an income until she went to New York. She derived it from dressmaking. I visited the family in New York. They were supported by my Uncle Jim. My daughter went to the public schools and then to a boarding school at Ft. Edwards, called the Ft. Edwards Seminary. I did not send her. I could not afford it. Well, I had something to do with the education of my daughter. I paid for some of her painting lessons. I always sent Mabel money when I could, but

the fact is I was not able to pay for her education. It devolved largely on James D. Andrews. Don't know whether my daughter graduated from the public schools. The expense of sending my daughter one year to the institute was not paid by Uncle Jim. It was defrayed by the family. Uncle Jim was dead then. The last time I saw Uncle Jim was in the year of 1889, ten years before his death. I did not see my grandmother during that ten years.''

The conduct of the parties subsequent to the making of the deed is very significant, not only in its acquiescence, but in disclosing their understanding of the transaction. The deed purported in terms to have been made ''for several valuable considerations.'' Jessie discloses her mother's understanding subsequent to the execution of the deed as follows: ''Q. Did you have any talk with your mother about the deed from the time it was acknowledged in New York until her death? A. Yes, sir. Q. What was it? Well, during my brother's life she always spoke with reference that he would do what was right. I know the time when my brother deeded the land in question to Mary, now Mary Armagast. I knew of the conveyance. Q. After your brother's death, did you have any talk with your mother about the land? A. Yes, sir; she talked about it. Q. What did she say? A. She thought things were always going the same as they had when my brother was alive, the house would be kept, and everything would go on the same. She thought that was understood.''

About two years after the execution of the deed, James D. executed a conveyance to the land to his two children. This was known to the mother and the sister and was acquiesced in. This conveyance was not in fact delivered. But in the early part of the year 1900 and about three months before his death, while he was helpless in his sickness, he executed a conveyance to his daughter Mary, the defendant herein, and this was known to the mother and to the sisters and acquiesced in. In 1899 James D. executed a bill of sale of all the farm

products on the place to his daughter Mary. He was at that time physically helpless and unable to sign his own name except by a mark. That instrument is in evidence. It is conceded to be in the handwriting of Jessie Andrews. She prepared it and guided the hand of her brother in the making of his mark thereto. There was full acquiescence thereto. This also was known to the mother. James D. died in May 1900. The life insurance already referred to was still in force payable to his mother and was collected by her. It is surely a fair inference that this was at least one of the considerations referred to in the deed of conveyance. That this insurance figured in the mutual considerations of the family is disclosed somewhat unwittingly in the testimony of Jessie. After collecting this insurance, the mother turned it over to Jessie. This is explained by Jessie in her testimony as follows: "It was a part of my brother's wish that the insurance should be turned over to me." Jessie also received from her mother the fund of $4,000. The dealing of the family with the daughter Mary after the death of James D. is entitled to consideration. It appears that in 1898, about the beginning of the sickness of James D., and just before he went away upon a trip for his health, a settlement was had between him and his mother whereby he executed to her his note for $1,200. The mother held this note unpaid at the time of the death of James D. The daughter Mary paid this note. She also paid the rent on the home for several years and until after the family was broken up by the death of the mother and Margaret Gray. These performances on her part were in pursuance of the mutual understanding of the family and were in accord with the understanding of the mother as testified to by Jessie. She was under no obligation to do these things, except as she had stepped into the shoes of her father in the ownership of the land and was for that reason performing his obligations. These undertakings, therefore, ought to be considered as a part of the consideration contemplated by the parties in the recitals of the deed. After the death of James D. the wit-

ness Christy, of Iowa, visited the family with a view of becoming agent for the land. He did afterward become such agent. It appears from his testimony that Mrs. Andrews spoke of the land as "Mary's land."

There is another circumstance in this record that tends to explain why no provision was made by Mrs. Andrews for Mrs. Margaret Gray in the distribution of her estate. There was an older son, Peter, who went to California in an early day and spent his life there. He never married. At the time the deed in question was made, the plaintiff herein was in California with her Uncle Peter. He died intestate shortly thereafter leaving a substantial estate. The plaintiff received it all. Margaret Gray had been the most dependent of the family and had received the most assistance. In a sense, she brought into the family the burden of three generations. Her brother had supported not only her, but her daughter and her granddaughter. She was the least capable one of the family. According to Jessie's testimony, she received all her mother's money with the understanding that she would take care of Margaret. This was what James had done for forty years before the conveyance was made to him, and it is a fair inference from this record that he was undertaking to do so to the end. It is undisputed in this record that Mary bore every expense needed by Margaret from the time of her father's death to the time of Margaret's death.

Mrs. Andrews died in 1903. Margaret Gray died in 1906. Before the death of Mrs. Gray every statute of limitations under the laws of New York had run against an action to assail the conveyance. During all that time it had never been questioned and never was questioned until the plaintiff brought this action in 1909. The conduct of all parties interested directly or indirectly was at all times consistent with the good faith of the conveyance and was at all times inconsistent with any other theory. It seems to me that this kind of evidence ought to be more satisfactory as extrinsic proof than any mere words. The fault that I find with the majority opinion

at this point is that it has looked for words and has ignored the long years of mutual and consistent conduct of the parties. If such a transaction as this is to be called in question long years after the death of the parties thereto, I know of no more satisfactory form of evidence than the long-continued conduct of the interested parties. I feel constrained to say, therefore, that the deed in question represented the intelligent act and wish of the grantor; that it was fully understood both by the parties thereto and by the other members of the family; and that there never was a moment of misunderstanding on the subject.

The original cost of this land was about $1,000. The conceded contributions of the young man to his mother from 1857 to 1871 alone would have paid for it more than twice over. Without these contributions, the mother must have sold it and absorbed the proceeds in living expenses. Instead of investing his money in property for himself, he gave it generously to his mother.

The law could give him no cause of action for his generosity, but the mother could. She recognized her moral obligation and distributed her property accordingly. From the parental point of view it was just.

According to Jessie's understanding, as heretofore quoted from her letter of 1907, the conveyance was made "from a sense of justice for what he had done" and upon promises of continued provision for support of the family. These promises of support were faithfully performed by James while he lived, and, after his death, by his daughter as his successor in title.

By the same arrangement the life insurance went first to the mother, and then to Jessie. If James D. had known that his daughter took nothing by his conveyance of the land to her, surely he would have made other provision for her. The only other provision he could have made for her was to make her payee of his life insurance. The mother and sisters not only availed themselves of the immediate fruits of the con-

veyance during the life of James D. and of his life insurance at his death, but they accepted thereafter years of performance by his daughter Mary. And now after the full performance, and after the death of the parties to the transaction, and after the expiration of thirteen years, it has remained for a descendant to come into the Iowa courts to ask relief against the conveyance. It seems clear to me that she is entitled to none.

II. I am not fully satisfied with the majority opinion of the question of the statute of limitations, nor am I ready to say that it is erroneous. If it is not erroneous, it is because of legislative oversight. The parties were all residents of New York. Every statute of limitations in their own state had run against them. If they were not barred in this state, it is because there is no statute of limitations applicable to them. An action could be brought twenty years hence as well as now. It is a deplorable state of the law, to say the least.

III. I am fully convinced that the action ought to be deemed barred by laches. If an action had been brought in New York to declare the conveyance fraudulent, it is clear that a plea of laches would lie as being kindred to the plea of statute of limitations. To allow the statute of limitations to run before bringing an action is prima facie laches. If failure to bring this action before 1909 would be deemed laches by the courts of the state of the parties to the transactions, it ought to be deemed such here. The long delay has resulted in manifest disadvantage to the defendant. Especially is this so, if she is required to support her title by positive and detailed and direct extrinsic proof. I do not care to discuss this point further than to cite two of our previous cases and adopt here what we said there. *Mathews v. Culbertson,* 83 Iowa, 434; *McBride v. Caldwell,* 142 Iowa, 228.

I would award decree to the defendant on the merits.

SHERWIN, J.—I join the above dissent of Judge Evans.