ARTHUR ELLIS, Plaintiff, Appellee, v. GRACE ALLMAN and EDWARD ALLMAN, Defendants, Appellants.

No. 41891.

SEPTEMBER 26, 1933.

REHEARING DENIED JANUARY 12, 1934.

Thomas J. Bray, for appellants.

Devitt, Eichhorn & Devitt and McCoy & McCoy, and Lamonte Cowles, for appellee.

ALBERT, C. J.—The record in this case consists of more than 600 pages and it would be of little use to the bench, bar, or parties to attempt to summarize the same, but we shall state sufficient of the record for an intelligent understanding of the matters involved, and give our conclusions as to the remainder without detailing the same.

For many years prior to March, 1918, F. M. Ellis and his wife resided on a farm of 120 acres situated a few miles north of the town of Fremont in Mahaska county. At that time Ellis bought an acreage property in the town of Fremont and moved thereon, where he resided until the time of his death. The plaintiff, Arthur Ellis, and the defendant, Grace Allman, are the only children of Ellis and his wife. Mrs. F. M. Ellis was ill for some three months preceding her death, which occurred on the 16th day of September, 1930, at which time she was of the age of 70 years. F. M. Ellis died August 13, 1931, at the age of 75 years.

The daughter, Grace, was married to Ed Allman, the other defendant herein, on the 5th day of May, 1915. They moved to Webster City where they remained for over two years, and in March, 1918, when the father moved to Fremont, they moved to the Ellis farm where they resided until the fall of 1925. They then moved to Fremont where they purchased a home, and the husband clerked in two different stores for three years, and then started a meat market. Later he worked for the Larson Construction Company on pavement in 1929 and 1930. During the time the defendants lived in Fremont, Mrs. F. M. Ellis had various sick spells and was taken care of by Grace. During the last illness of the mother, Grace returned about June 26, 1930; her mother being in bed and very weak. The mother, however, recuperated after two or three weeks and Grace returned to her home. The mother suffered a later attack and Grace then came to the parental home and took care of the mother and the household until the death of the mother. At this time

the father was incapacitated and was only able to get around on crutches. After the death of the mother, the father's condition did not improve and Grace continued to take care of the father's household. She seemed to be a woman of not very strong physique, and at times was scarcely able to carry the burden thus thrust upon her. In the latter part of October, 1930, her husband abandoned his work and came to assist her. The father's condition did not improve, and in fact he had a serious attack during the middle or latter part of December, 1930. His ailment, according to the testimony, was cancer of the prostate gland and he suffered much pain at times, and also had a dropsical condition. He was under the care of a physician and improved until the latter part of January following. He had a relapse in February, and after having obtained partial relief therefrom, his illness extended over into March, when he showed marked improvement. This improved condition continued until the middle or latter part of July. During the time of this improved condition, he was out of bed and sometimes ate his meals at the table. During the time he was under treatment by a physician and during a following attack in January, 1931, he was given morphine, one-eighth of a grain at a dose once a day, and later was given the same dose twice a day. A large part of the time during his sickness he had either Grace or her husband with him during the day and night.

His confinement to his bed for such a length of time caused him to develop bedsores on his body, which were very distressing and demanded constant attention.

On the 11th day of June, 1931, F. M. Ellis made a warranty deed to all of his property to the defendant, Grace Allman, and at the same time a contract was made between him and Grace and her husband, the details of which will be later set out, and it is to set aside this deed and contract that this action is brought.

The plaintiff avers that at the time of the making of the deed and contract, Francis M. Ellis was a person of unsound mind. The deed and contract were obtained by deceit, fraud, and duress. They were without consideration; were procured by undue influence, and a fiduciary relation existed between Grace Allman and Francis M. Ellis and the defendants took advantage of such fact to procure the execution of the deed and contract.

Aside from medical testimony, the plaintiff introduced fourteen witnesses, no one of these witnesses testifying that F. M. Ellis

was of unsound mind at or before the time these instruments were executed. On the other hand, three of them, when asked as to his mental condition, said "it was good".

Some of them testified as to business transactions had with Ellis during his sickness, relating the facts and circumstances thereto, none of which indicate any lack of mental capacity. Others testified as to having visited with him on various occasions during his last sickness, and with few exceptions testified that he talked intelligently on the subjects discussed. Some two or three testified that at times they called he "mumbled" his words so they could not understand what he was saying. The evidence generally shows that he was a slow talker, and also shows that when he was suffering pain, or when he was awakening from sleep in some instances, his language was not always clear, and he talked in low tones, and his language was not clearly distinguishable or understandable. This was true in the early part of his sickness in December and January.

Some of the plaintiff's witnesses testified that they called and were refused admission. This, to our minds, indicates nothing. It is a frequent occurrence around sick rooms that a patient is sleeping or attempting to sleep, or is in such weakened condition that visitors are not welcome.

As already stated, the plaintiff introduced fourteen witnesses who were visitors at his home during this sickness, and the defendant introduced about thirty witnesses who also visited Ellis during this time. There can be nothing in plaintiff's contention, therefore, that there was an attempt to "carry matters on secretly" by reason of the refusal to allow certain visitors to see the patient.

During all of the time until the 11th of June, 1931, Ellis carried a bank account, and on one other occasion borrowed money from the bank, transacting the business himself. Of course, he was not able to get out to look after these matters himself, and such transactions occurred at the home. The evidence shows the transactions were his own and were carried on intelligently. He advised his banker that any checks that Grace drew on his account were to be honored by the bank. The money to care for the household expenses was furnished by Ellis on checks drawn mostly by himself. They were taken to the bank by Grace or her husband, money drawn thereon, and returned to the father who handled the same.

At this point it might be well to dispose of one question which is a bone of contention between the parties; that is, on whom

rested the burden of proof in this case. It is insisted by the plaintiff that the burden of proof was on the defendant because of the fiduciary relation which existed between Grace Allman and her father. It seems to be quite well settled in this state that, if such fiduciary relation did exist, the burden was on the defendant. This rule has been announced so many times in this state that we need not cite our cases thereon. The question therefore is whether or not, under the record made in this case, such relation did exist. We have read this record with care and given plaintiff the benefit of everything in the record which would point in this direction, and we find that the plaintiff has not established such a set of facts as will support the claim that a fiduciary relation did exist between the father and the daughter. There is nothing in the record to show that she was the superior character of the two, that she was more highly intelligent or had better business ability than her father, or a wider experience. There is nothing to show that she took advantage of the fact that she was the daughter of F. M. Ellis or that she in any way took advantage of him. As will be later shown, the deed and contract were not made at the suggestion or importunity of either Grace or her husband; that the idea of making this conveyance and the contract was wholly voluntary on the part of the father. With this condition existing, there could be no fiduciary relation between the father and the daughter. It follows that the burden of proof in this case was on the plaintiff.

The history of the last sickness of the father, as depicted by the various witnesses for the plaintiff, shows nothing out of the ordinary history of sickrooms. Of the plaintiff's witnesses, nine made no expression whatever as to the mental capacity of F. M. Ellis. Three said that when they interviewed him his mental capacity was good. One witness who visited him when he was in a depressed condition testified that in his opinion he was weakened bodily and mentally.

The defendants offered the testimony of 24 witnesses who were immediate friends of the deceased, many of whom visited with him frequently, and the strange thing is that of all the witnesses offered by both the plaintiff and the defendant, none of them testified to any lack of mental capacity on the part of Ellis. Aside from this, his attending physician, who was with him through all of his illness, said that his mentality was not affected. Expert testimony was introduced on the part of both the plaintiff and defendants, and, as

usual, there was a square conflict therein, so this testimony is in fact entitled to very little weight in reaching a conclusion.

It is apparent, therefore, that the plaintiff must fail in his charge of mental incapacity. He also must fail for want of evidence on a charge of deceit, fraud, and duress, as there is no evidence whatever showing any of these last-named elements.

One question left, therefore, is the question of whether or not, under the whole record, it can be said that plaintiff has sustained his burden of proof of showing that this deed and contract were obtained by undue influence.

On this question we think the weight of testimony is largely, if not wholly, with the defendant. As heretofore said, this deed was made on the 11th of June, 1931. The undisputed testimony is that on the 10th day of June, 1931, F. M. Ellis caused a communication to be made with W. H. Keating, an attorney, about 70 years of age, and a member of the Mahaska county bar who had been in the practice for 40 years, had known Ellis for 25 years, and had acted as Ellis' attorney during all of that time. Prior to the death of the wife of Ellis, Keating had drawn a will for him in which he gave a life estate in all of his property to his wife, and the 40 acres with the buildings on the home farm to Grace, and the balance divided between Grace and the plaintiff. In response to this call, on the 10th day of June, Keating went to the Ellis home and after a short talk with Ellis, Ellis told him to get a chair as he wanted to talk to him.

Ellis said to Keating, "Well, I want to fix my property now just the way I want it. My wife is dead and I must make a change. I have no one to take care of me except my daughter and her husband and they have given up their home at my request and she will have to take care of me as long as I live. She is sick and it is very hard for her to do this work, but there is nobody else that I can ask because I don't want strangers to care for me."

Keating said, "What do you want?"

Ellis said, "Well, I think I will give her a deed to this property and all of the property I have."

Keating said, "Do you mean to give the deed now or do you want the deed left in escrow?"

Ellis said that he wanted a contract of some kind about that so it would be fair to all of them. Ellis said he wanted a contract

drawn which would express the intention of giving to Grace all of his property, and she would have to take care of him and make a home for him. Ellis further said:

"She has never asked for a cent; I am going to do this for her. I want the contract to show just what I am doing, and I want to reserve for me $60 a year while I live, and the deed to be made. She is to have all the property of every kind and nature that I have, except there is no need of putting in the things that are in the garage or the furniture in the house. That Grace and Arthur can divide between themselves any way they see fit."

Ellis told Keating to bring down the will when he brought the contract and deed. Keating said that, as he remembered it, Dr. Forsythe was in the room during the conversation, but he did not see Grace or Ed Allman that day. Keating was to and did bring back the papers the next day, together with the will. Ellis asked who was to pay for Keating's coming and going, and Keating told him he did not have a car and would come out in a taxi, and, of course, his expenses would have to be paid, and Ellis said, "I will send for you if that will be all right." Keating said he was there 15 or 20 minutes, and Ellis talked as well as he ever remembered of his talking. There was no stoppage in his expression; he expressed himself just as freely and clearly as he ever knew him to express himself. He noticed no change in Ellis' mind or his mental condition from what it had been for years before. He went back to town and prepared a deed and contract and returned with the same the next day, June 11th. He sat down beside the bed of Mr. Ellis and read these instruments to him. No one was present except Mr. Ellis and himself. After he read the contract to Mr. Ellis, Ellis called his attention to the fact that he had omitted the $60 provision therefrom, and said to Keating, "I want that fixed so that I shall have $5 a month," and also called Keating's attention to other matters that he had omitted which he then interlined.

It appears that one matter which was omitted in the draft of the contract was that the daughter was to receive the entire income from the farm, including the crop of 1930, and was to pay Ellis' personal indebtedness, and these matters were interlined by Keating before the contract was signed. Keating said that after having made the interdelineations, the contract was then read over to Ellis by him, and, as he remembered it, Ellis took it and read

it himself; that Ellis sat up on the side of the bed and read the contract, and, after reading it, said it was just exactly the way he wanted it, and he then read the deed. Ellis then directed that Grace and Ed Allman be called in. The papers were given to them to read, and Ellis said to them: "There is no one to take care of me and I am doing this for that reason, and is this going to be satisfactory to you people, and are you willing," he said to Grace, calling her by name, "are you willing to do this for me, and will you stay and take care of me," and she said she would, and all of them signed the contract then and there, and Ellis signed the deed.

That day Ellis said to Keating, in a subsequent conversation:

"I had the wish that Arthur would come and see me, and on Decoration Day I had Grace clean me all up and change my clothes, and I sat up nearly all forenoon Decoration Day, thinking that as it was Decoration Day there would be little to do and Arthur would come and see me, but he didn't come."

We are disposed to give much force to this testimony relative to the conditions under which this deed and contract were made. Some criticism is made of Keating's testimony because he had something to do with the trial of this case, but we do not think there is anything to show that his testimony should be disregarded therefor. The facts that he recited were so real and are the natural facts which would surround a transaction of this type. There is nothing in the record to show any solicitation or even a request on the part of either of these defendants that this deed be executed or this contract made. The conduct of the father, under the circumstances, is such as would naturally happen where a daughter gave the care and attention he received in this case, and devoted her time and attention to such care.

Much stress is laid upon the contention that under the will made before the death of his wife, Ellis treated his children equally, which contention is not supported by the record, and authority is cited on the effect of such a will under somewhat similar circumstances. In the absence of all showing of any cause for such conduct, we would be disposed to give some weight to the contents of the prior will, but the record shows that the father had some feelings against the plaintiff in this case. Aside from the above conversation with Keating, it is shown that the son had left the parental home when he was past age, established himself in a lucra-

tive business, and had prospered therein; that the father and mother went to visit him at Burlington, his place of residence, and instead of housing them in his home, he took them to a hotel. This is explained by the plaintiff that his conduct was caused by the fact that there had been a death in his wife's family, but it seemed nevertheless that the father had some feeling because they were not taken to the son's home on this trip. More than that, while he knew the son was in business and had business troubles, and remarked to him that the father would call him when he needed him, yet the evidence shows that the father resented the fact that his son, while only 90 miles away, did not call on him more frequently during his illness.

An elaborate discussion of the setting aside of a deed on the ground of undue influence is found in the case of Hess v. Pittman, 214 Iowa 269, 242 N. W. 113. Among other things we there said:

"Solemn instruments affecting the title to real estate are not to be disturbed unless upon such proof as clearly and convincingly establishes that such instruments are not the free and voluntary act of a person possessed of sufficient mentality to have executed the same intelligently. The burden of proof is upon the plaintiff to prove the undue influence and the mental incapacity of the grantor."

Plaintiff lays much stress upon the case of Curtis v. Armagast, 158 Iowa 508, 138 N. W. 873, where the doctrine of constructive fraud is elaborated. The relation in that case between the son and the mother was entirely different from the relation between this daughter and her father. In that case, among other things, it is shown that the deed from the mother to the son was executed at the request and by the procurement of the son; was wholly without valuable consideration, and without any provision or binding obligation on the son's part to support her or her daughters, and the son at the time was her agent and sole manager of her property, and she had entire faith and confidence in his judgment and fidelity.

We feel, therefore, that the plaintiff has not brought himself within the conditions of the Curtis case and many other cases following the same.

It is argued that because Grace had been told by the doctor that the father's days were limited, that he might die shortly and might live for some time, she should be defeated in this proceeding. This element is properly considered when it is in the right setting.

It might have strong force and effect if there were a showing here that the contract and deed were procured through the importunities or solicitations of the defendant, but, as we think, the record shows that the making of the same was purely voluntary on the part of F. M. Ellis, without solicitation of any kind from the daughter or her husband.

Our attention is called to certain conflicts in the testimony of Grace Allman and also to certain parts of her testimony and of the testimony of some other witnesses which is claimed was not admissible under section 11257 of the Code of 1931. Without stopping to determine whether or not such testimony does conflict with the aforesaid section, in reaching our conclusion in this case, we have disregarded the said testimony.

The record shows that the plaintiff has failed in his burden of proof establishing that this deed and contract were procured by undue influence.

 One other question is urged to support the plaintiff's contention herein, and that is, the deed and contract were without consideration.

Aside from the light thrown on this subject by the testimony of Keating, we find that the deed, among other things, recited:

"The real consideration of this deed is that my said daughter above mentioned had cared for my wife, her mother, when the mother was unable to take care of herself, and also the agreement between my daughter and myself that she is to take care of me during the remainder of my life. If I make a will the same shall not be in conflict with the terms and conditions of this deed; nor shall this deed be a full satisfaction, or in violation of the terms of the will, each instrument to act and operate separately and distinctly from the other."

It is apparent from the expression of the maker of the deed that aside from the recited consideration of one dollar, the real consideration therefor was the service performed by the daughter in the care of her mother, and also the agreement of the daughter to take care of her father during the remainder of his life.

The contract among other things, recites:

"That during the last years of my wife, Anna C. Ellis, the said parties of the second part (defendants) administered and took

every care possible of my wife, and have administered unto me in the same manner because of my infirmities in the past, and realizing that I must have personal care and attention of someone continuously until my death; and in consideration of the agreement between myself and my daughter and her husband to provide for my wants in every way, taking care of the home and of me, furnishing clothing, food and medicine in case of sickness, with the attendance of a. physician when necessary, and making full and ample provision for my comforts, I have this day executed a deed to my daughter, conveying to her all of my real estate of every kind and nature, (here the property is described)."

The contract further provides that the entire income thereafter, including the crop of 1930, was to pay all expenses of every kind, including his indebtedness, and the repairs, fencing, insurance, taxes, and all legal assessments, and any and all other expenses necessary thereto; "and to furnish provision and care for myself, with a home, its comforts, and to pay me a consideration in cash annually during my lifetime for my personal expenses, the sum of sixty dollars; payable five dollars per month on June 19, 1931, and monthly thereafter, also to pay for my last sickness and all funeral expenses of every kind and nature."

The contract then provides that if the second parties fail to carry out the terms of the contract such deed is canceled and held for naught.

The contract is signed by F. M. Ellis and Grace Allman and Fred Allman.

With these recitations on the part of F. M. Ellis, it cannot be said that there was not a legal consideration for this contract. Taking the case as a whole as made by the record, the plaintiff has failed to sustain the burden of proof cast upon him by the law, and the district court erred in finding for him in this case. It should have found for the defendants.

The motion to dismiss the appeal filed in this case is overruled.—Reversed.

EVANS, KINDIG, CLAUSSEN, and DONEGAN, JJ., concur.